UNITED STATES, Appellee

v.

DAVID P. KNOPH, Private E–1, U. S. Army, Appellant

2 USCMA 108, 6 CMR 108

No. 605

Decided December 31, 1952

 

LT. COL. George E. Mickel, U. S. Army, and 1ST. LT. William P. Higgins, U. S. Army, for Appellant.

LT. COL. Thayer Chapman, U. S. Army, and 1ST. LT. Richard L. Brown, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This case is before us on petition of the accused to review the record of his conviction for the offense of desertion in violation of Article 85, Uniform Code of Military Justice, 50 USC § 679. The accused was tried and convicted by general court-martial at Fort Custer, Michigan, on November 6, 1951. The accused was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances and to confinement at hard labor for two years, two previous convictions being considered. The convening authority on December 13, 1951, approved the findings and sentence. On January 22, 1952, a board of review in the office of The Judge Advocate General, United States Army, affirmed.

The specification of the charge in this case alleged that the accused, while serving at Fort Custer, Michigan, did, on or about August 8, 1951, without proper authority and with intent to remain away therefrom permanently, absent himself from his organization, and remained absent until his apprehension on or about September 12, 1951. The accused, after his arraignment, plead guilty to the lesser included offense of absence without proper authority in violation of Article 86, Uniform Code of Military Justice, 50 USC § 680, and not guilty to the principal offense of desertion. The law officer explained the meaning and effect of accused's plea of guilty to the lesser included offense in accordance with Paragraphs 53h and 70, Manual for Courts-Martial, United States, 1951. The accused persisted in his plea.

The sole evidence adduced by the prosecution consisted of two duly authenticated extract copies of the morning reports of Battery A, 79th Anti-Aircraft Artillery Gun Battalion (120 mm.) stationed at Fort Custer, Michigan, which established the inception of accused's absence without leave from August 8, 1951, and the termination thereof on September 12, 1951, a period of thirty-five days. In addition, an oral stipulation agreed to by the prosecution and defense, with the consent of accused, was admitted in evidence to establish the apprehension of the accused by a civilian policeman on September 12, 1951, in the city of Detroit, Michigan.

The accused, being advised of his rights, elected to testify in his own behalf. The facts which follow were elicited on his direct examination. The accused testified that his wife's illness was the reason for his absence; that he had left his organization without authority because he had been denied a three-day pass, after making requests to his First Sergeant and officers of the

**109**

Battery; that, after he had returned to his home, his mother-in-law, who lived in the same house, suffered a stroke and became a bed patient; that during his absence he remained at his home in Detroit helping his wife and mother-in-law by assisting with house work; that he planned to return to his organization in thirty-five days; that while he was absent without leave he had not taken a job and had had no income during this period; that he had left all of his possessions at his post and had worn his uniform approximately three-fourths of the time during this period of absence.

On cross-examination the accused testified that he requested a three-day pass on August 7 and could not understand why this request was not granted. The accused admitted his apprehension at the end of this absence without leave; that he had learned of his wife's illness through letters; that he had not received any word from the Red Cross requesting that he be given leave to return home; that, one week after he returned home, his wife was able to leave her sickbed; that his mother-in-law did not become ill until the week following the time his wife was ambulatory. The accused also testified that his wife's sister lived in the same home.

Our examination of the trial record discloses what we consider to be a very pertinent portion of the accused's testimony on cross-examination—trial counsel asked and the accused answered the following questions:

QUESTION: "Just when did you intend to come back?"

ANSWER: "I intended to come back quite a few times, sir, but I couldn't make it."

QUESTION: "Had you set a definite date when you would come back?"

ANSWER: "No, sir."

QUESTION: "Had you said, 'Well, when conditions reach a certain point, then I will go back'?"

ANSWER: "Yes, sir."

QUESTION: "What were the conditions?"

ANSWER: "Well, when everything was running smoothly, sir."

QUESTION: "Had things been running smoothly prior to the time you came home?"

ANSWER: "Yes, sir."

QUESTION: "Had not your mother-in-law been ill before that time?"

ANSWER: "Quite a few times, sir; but when she was ill before, I wasn't in Service."

It is on the basis of the entire trial record that we are asked to determine the issue presented to us on appeal. As we review the trial record in the instant case we come to the indisputable conclusion that neither counsel for the Government nor the defense demonstrated the degree of professional responsibility and diligence expected of them and imposed upon them by the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, 1951. Our examination of the trial record in this case indicates that neither counsel for the prosecution nor the defense fully exhausted the means at his disposal to produce evidence available and competent to corroborate or to deny the contention of accused.

The Uniform Code of Military Justice became effective May 31, 1951, after long and careful study by the Congress. Sufficient time has elapsed for all military officers engaged in the administration of the Code to become familiar with the spirit and intent of the Code. The Code provides many safeguards for the use of defense counsel to fully protect the rights of the accused. Likewise, adequate provision is made for trial counsel fairly and adequately to present the prosecution case in the name of the United States. The Manual for Courts-Martial, United States, 1951, further implements the safeguards that are provided in the Code. A military officer acting as trial, or defense, counsel has a distinct and definite responsibility to see to it that the rights of the accused are fully protected at all times and to present to the trial court all pertinent evidence that is readily available. With this admonition, we proceed to consider the merits of the issue in the case at bar.

The duly authenticated extract copies of the morning reports of the accused's

organization, together with his plea and admissions as a witness, clearly established the lesser included offense of absence without leave in violation of Article 86, Uniform Code of Military Justice, supra. Consequently, the only question is whether there was sufficient evidence to support the finding of an intent to remain away permanently. This precise issue has been considered by us in United States v. Peterson (No. 199), 3 CMR 51, decided April 17, 1952; United States v. Ferretti (No. 213), 3 CMR 57, decided April 18, 1952. In these cases we carefully laid down the principles that will guide us in our determination of cases like the one before us.

Appellate defense counsel urges that our decision in United States v. Peterson, supra, is controlling in the instant case. We do not agree. It is our opinion that the case at bar is distinguishable from Peterson on the following grounds: (a) the accused in this case was apprehended; (b) the statements of the accused on the witness stand were inconsistent, damaging to him, and supplied omissions that were not produced in the Government case.

We briefly recount several patent inconsistencies that occurred in accused's direct and cross-examination. The accused in his direct examination stated he intended to return to military control on the thirty-fifth day of his absence. It is significant that he was apprehended on the thirty-sixth day of his absence in Detroit, Michigan. In this connection the accused, upon cross-examination, testified in substance that he had no definite date in mind as to when he would return to military control. On direct examination, accused stated he had returned home because of his wife's illness. It is noted that accused admitted that one week after his return his wife was well enough to leave her sickbed. His mother-in-law and sister-in-law were both at home during this period. One week after his wife was out of bed, his mother-in-law became ill and was confined to bed which fact, in accused's opinion, required him to remain at home until apprehended.

We believe that the evidence of this case, including that offered by accused, was adequate to warrant the members of the court-martial to draw the inference that accused intended to remain away permanently. There is further support for this conclusion in accused's admission on cross-examination that he had not formed a definite date in his own mind as to when he would return to military control. In this connection, it appears from accused's testimony on cross-examination that he said to himself: "When conditions were such that everything is running smoothly, I will return." This expressed intent on the part of the accused to return to military control, conditioned on the occurrence of a subsequent fact, which might, or might not, have materialized, justified the rejection by the members of the court-martial of the accused's contention that he did not intend to remain permanently absent from the military service.

We conclude that there was sufficient evidence in the trial record to support the finding that the accused intended to remain absent from his organization permanently, and we cannot substitute our judgment for that of the triers of fact in this case. United States v. McCrary (No. 4), 1 CMR 1, decided November 8, 1951.

Accordingly, the decision of the board of review is affirmed.

Judge LATIMER concurs.

BROSMAN, Judge (dissenting):

I do not believe that the Government has carried the burden of proof imposed upon it by the test of evidential sufficiency previously announced by this Court in a number of decisions. The majority finds the situation presented here to be markedly different from that found in United States v. Peterson (No. 199), 3 CMR 51, decided April 17, 1952. In my view the points of difference are few indeed. Certainly this case is much unlike United States v. Ferretti (No. 213), 3 CMR 57, decided April 18, 1952. In truth, the fact complex of the instant case appears to me to fall between those of the two just cited. In observing that each sufficiency problem must rest on its own bottom, we used the following language in Peterson:

"In the present instance we are faced with a problem frequently, if not usually, arising in cases of alleged desertion. In such a situation a clear showing of unauthorized absence is typically present through the routine presentation of extract copies of official military records—leaving as the only controverted question the sufficiency of the evidence to support the finding of an intention to remain away permanently, to avoid hazardous duty, or to shirk important service, as the case may be. *It is in this area that the presence or absence of facts—or perhaps even of a single fact—may lead to divergent results.* Accordingly, in this case, as elsewhere, it is our duty carefully to review the evidence for the limited purpose of determining legal sufficiency. . . ." [Emphasis supplied]

Pursuing the directive contained in the final sentence of the foregoing quotation, I shall proceed to marshal the evidence in the case at bar bearing on intent. Here the *only* evidence adduced by the Government to sustain its charge of desertion with *intent to remain away permanently* is (1) an unauthorized absence of thirty-five days, and (2) the fact that the absence was terminated by apprehension. In the other pan of the balances we have the full and circumstantial explanation of the accused as related by him from the witness stand. This story certainly was not inherently improbable in any usage of the term, and, although readily rebuttable, if untrue, it was wholly uncontradicted. According to this account, the accused's wife became ill and required his sympathy and attention. He requested a three-day pass from his First Sergeant and from officers of his battery, but the application was denied. Thereafter, he absented himself from his station at Fort Custer, Michigan, and went to his home in Detroit, Michigan, only a short distance away. Shortly after his arrival at home, and his wife's recovery, his mother-in-law, who lived in the same house, became seriously ill, and he remained there at all times with the two women, nursing each and assisting in the household chores. He remained in

**112**

Detroit, his home of record, throughout his entire absence; he made no attempt to conceal himself; he did not hold or seek civilian employment, and was without income during the period; he did not remove his effects from his quarters at Custer; and he wore his uniform during most of the time he was in Detroit. He categorically denied an intention not to return, and stated that, in fact, he intended at all times to rejoin his unit as soon as conditions improved at home.

Now the accused's story was in substance, either true or false. Even if true, he certainly displayed indefensible judgment, he deliberately violated military law, and he must be the subject of punitive action. However, he was not guilty of any sort of desertion. If wholly false, on the other hand, he was clearly guilty of an extremely serious military offense. Likewise if only partially false, no one could with justice question the determination of a court-martial which rejected his account in toto. However, no attempt whatever appears to have been made to investigate the story, despite the ease with which this could have been accomplished, and certainly none was made to refute it in any single particular at the trial. It goes without saying, of course, that I am not seeking to pass on the truth or falsity of the accused's explanation—for this is beyond the province of a member of this Court. I am, however, genuinely seeking to evaluate the reasonableness as a matter of law of the court-martial which tried Knoph in light of the evidence its members had before them.

The majority finds ":damaging" conflicts in the accused's testimony. I see nothing to justify this conclusion. It is true that at one point, after asserting repeatedly that he intended to return to his organization as soon as "everything was running smoothly at home," he stated that he had planned to remain out of military control for a period of thirty-five days. This must be the conflict which troubles my brethren, for it is the only one I have been able to find. As for myself, I hardly regard it as a serious inconsistency which completely vitiates the effectiveness of the accused's testimony. Giv-

ing it its maximum effect, and considering it realistically, it rather suggests that the accused had been unreliably informed that thirty-five days constituted the maximum period one might remain in unauthorized absence without becoming liable to conviction as a deserter. Although this may indicate that the details of Knoph's explanation were stated with something less than accuracy, it also suggests forcibly that he did not intend to desert.

At worst, as has been suggested, the accused's thirty-five-day story sounds very much like an absence without leave carefully calculated as to length for the purpose of avoiding a charge of desertion. Considering him as a recidivist absentee without leave—a type from which the military services are not free, unfortunately—he is doubtless an unreliable and irresponsible, possibly even an entirely worthless, person fully meriting—under most penal theories—punishment substantially in excess of that permitted by the Manual's Table of Maximum Punishments. This, however, involves problems beyond our power to solve by judicial opinion. Rather their solution rests within the policy determinations of The Congress or of The President, through his Executive Order, the Manual for Courts-Martial, United States, 1951. Certainly so long as this bench sits as a court of law, rather than as an agency for the administration of paternalistic discipline, it should not, in pursuit of practical goals, countenance an attribution to the word "intent" a meaning not accorded it elsewhere.

The majority has referred to what it regards as the conditional character of the accused's intention to return to military control. It is true that the following language is found in the Manual for Courts-Martial, United States, 1951, paragraph 164a(1):

". . . and a purpose to return, provided a particular but uncertain event happens in the future, may be considered an intent to remain away permanently. . . ."

It is apparent either that they and I do not read this language alike, or that we differ sharply as to the accused's professions. I do not understand him to have stated that he would return to his station only *if* or *provided* "everything was running smoothly at home." Rather I think he said *when* "conditions" cleared up. To some this may seem a quibble over semantics. To me, however, it is highly significant in so far as it bears on Knoph's profession of *intention*. To him the future event was not uncertain of happening at all, but only doubtful as to the time it would occur—and this interpretation is supported by the very logic of the situation. Moreover, *when* this genuinely certain event transpired, he intended to return. It must be remembered that it is his *intention* we are seeking—not a merely mechanical, artificial, and legally crystallized expression thereof. I am quite sure that the present case does not contain an example of what the Manual's draftsmen contemplated in paragraph 164a(1). Moreover, the Manual's quoted language does not require of the court-martial an adverse view as to intent; it only permits it. And here, as elsewhere, a court-martial's conclusions are subject to review in this Court for reasonableness as matter of law.

The evidence, as I see it, weighs at least as much in favor of innocence as of guilt, and is, therefore, insufficient to sustain the conviction of desertion. United States v. Shull (No. 45), 2 CMR 83, decided February 18, 1952. Of course, by plea the accused is guilty of an absence without leave of thirty-five days.