UNITED STATES, Appellee

v.

BORIS HAIMSON, Captain, U. S. Army, Appellant

5 USCMA 208, 17 CMR 208

211

No. 4549

Decided December 3, 1954

Affirmed

Frederick Bernays Wiener, Esq., and 1st Lt Richard C. Shadyac, U. S. Army, for Appellant.

Lt Col Charles M. Munnecke, U. S. Army, Lt Col William R. Ward,

U. S. Army, MAJ Irvin M. Kent, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Following trial by general court-martial at Heidelberg, Germany, the accused was convicted of soliciting and receiving a bribe in violation of Article of War 96, 10 USC § 1568, and of twelve offenses of like character, all in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to dismissal and total forfeitures, and as well to confinement at hard labor for seven years. The findings and sentence were approved by the convening authority and have been affirmed by a board of review in the office of The Judge Advocate General, United States Army. We granted the accused's petition for review, limited to the following issues:

(1) Was the convening authority an accuser within the purview of the Code and thus disqualified from convening the court-martial?

(2) Was the court-martial without jurisdiction for the reason that its members were not personally appointed by the convening authority?

(3) Were the Staff Judge Advocate and the Assistant Staff Judge Advocate disqualified under the terms of Article 6(c) of the Code from reviewing the record of trial?

(4) Was prejudicial error committed by the law officer in permitting certain witnesses for the prosecution to testify concerning specific instances of misconduct upon which they based their unfavorable opinion of the accused's character?

## II

Since none of the errors assigned by appellate defense counsel relates to the sufficiency of the evidence, the necessity for a detailed summary of the facts forming a predicate for conviction is obviated, and only such as are essential to a disposition of the issues involved will be stated. With respect to the first three questions presented, the following facts are pertinent. On January 28, 1953—and following the usual pretrial investigation — the present charges were referred for trial to a general court-martial convened "by command of Lieutenant General Eddy." Prior to the date of trial, a 3d indorsement to the charge sheet—which had been prepared by an Assistant Staff Judge Advocate and approved by the Staff Judge Advocate—was dispatched to trial counsel over the command line of the convening authority. This indorsement— the contents of which will be discussed more fully hereafter—was signed by an Assistant Adjutant General, and contained certain instructions to trial counsel concerning the preparation and presentation of the case against the accused.

In an attempt to ascertain the extent of the convening authority's interest in the case, appellate Government counsel interrogated under oath and prior to the filing of briefs before the board of review, Lieutenant Colonel Waldemar Solf, an Assistant Staff Judge Advocate in General Eddy's headquarters. Written cross-interrogatories were submitted by appellate defense counsel. The sworn statement thus obtained was attached to the Government's brief, and —deeming its contents to relate to a jurisdictional question—the board of review held that it might properly be considered. See Rule IX F 2, Uniform Rules of Procedure for Proceedings in and Before Boards of Review. This statement disclosed that the indorsement in question was originally drafted under Colonel Solf's direction by an officer assigned to the Court-Martial Branch, Judge Advocate Division, Headquarters, United States Army, Europe. Thereafter, it was revised and rewritten by the deponent, who was in charge of that department. Having been approved by the Staff Judge Advocate, it was forwarded to the office of the Adjutant General, where it was signed by an Assistant Adjutant General and referred subsequently to trial counsel. According to Colonel Solf's

testimony, the preparation by members of the Trial Section, Court-Martial Branch, of instructions to trial counsel of the nature found here had been a standing operating procedure in the Headquarters for approximately two years prior to the trial of the instant case. He also indicated that personnel of the Adjutant General's office were authorized to sign such indorsements on behalf of the Commanding General, and asserted that General Eddy did not participate in the preparation of the present 3d indorsement nor could he have possessed knowledge of its contents, either when originally drafted or at any time prior to the conclusion of the trial.

### III

In its consideration of this evidence for the purpose of determining whether the convening authority ▇▇▇▇ ▮ may be said to have been an accuser in this case, the board of review stated that "it is apparent that General Eddy had no knowledge that the indorsement was prepared and delivered to trial counsel and cannot, therefore, be called an accuser." As a preface to their principal argument before this Court, counsel for the accused have insisted that it is improper to "go behind" the command line in an attempt to dissociate the convening authority from the indorsement issued in his name. With this contention we fully agree.

The effect of a command line was posed for our consideration in United States v. Marsh, 3 USCMA 48, 11 CMR 48. There the accused was charged with the willful disobedience of an order transmitted to him by a confinement officer, but promulgated "by command of Lieutenant General Hodge." We took the view that General Hodge was an accuser and therefore disqualified to convene the court-martial which had tried the accused—this for the reason that the original order which Marsh had violated stemmed from General Hodge's authority without regard to whether the latter was personally aware of its issuance. It was the General's authority, and only his, which was arrayed behind the order.

In that connection we called attention to Army Special Regulations 310–110–1, dated March 1, 1951, which provide:

"11*b*. (1) The command line is the phrase *which states who is issuing the directive*. It reads 'BY COMMAND OF . . .' when the commander is a general officer and 'BY ORDER OF . . .' when the commander is below the grade of brigadier general." [Emphasis supplied.]

Also, we observed in Marsh:

"In discussing whether such an order, as the one relied on here, would be the order of the superior or the intermediate officer, Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at page 574, states:

'It may happen that an order is transmitted through several intermediate commanders, or other officers, to the individual intended to be reached: in such a case a failure to comply is a disobedience of the command of the superior from whom the mandate originally proceeded.'

"In interpreting this statement by Winthrop, the case of United States v. Hanold, 5 BR–JC 265, 275, states:

'. . . In passing on the order of a superior, an intermediate commander could make the order his own by the use of clear and unmistakable language indicating that he was placing his own authority behind the order. In such event a subordinate who willfully disobeyed the order would intentionally defy the authority of the intermediate commander as well as that of the superior. *Where, however, the intermediate commander is simply the agency through which the superior transmits his order, a violation of the order cannot be charged as a violation of the command of the intermediate.*' "

In light of the foregoing, we conclude that the 3d indorsement constituted a directive of General Eddy—and this is quite unaffected by the fact that it was composed without his knowledge by officers under his command. As staff of-

214

ficers, neither the Assistant Staff Judge Advocate who drafted it, nor the Staff Judge Advocate who approved it, possessed power to issue any sort of order save in the name of his commander. See Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 139. Moreover, it is clear that in signing the indorsement beneath the command line, the Assistant Adjutant General was acting in a purely representative capacity, executing the authority reposed in him by General Eddy and emanating from the latter's position as convening authority. Such representation will necessarily be utilized by a commander for almost every routine order; and to permit piercing the command line would conflict with common military understanding and custom and at the same time establish a disastrous precedent in military law. Accordingly, for every purpose relevant to this issue, we shall treat the challenged indorsement as if it had been prepared and executed by General Eddy personally.

## IV

In support of the first assignment of error appellate defense counsel contend that, by virtue of the instructions to trial counsel contained in the challenged indorsement, the convening authority had aligned himself with the prosecution and thus had become an accuser. Article 22 (b), Uniform Code of Military Justice, 50 USC § 586, withholds the power to convene a general court-martial from a commanding officer characterized by this status, in the following language:

"When any such commanding officer is an accuser, the court shall be convened by superior competent authority, and may in any case be convened by such authority when deemed desirable by him."

And Article 1 (11) of the Code, supra, 50 USC § 551, provides:

" 'Accuser' shall be construed to refer to a person who signs and swears to charges, to any person who directs that charges nominally be signed and sworn by another, and to any other person who has an interest other than an official interest in the prosecution of the accused."

Two standards must guide our deliberations in determining whether the convening authority is also an accuser in a given case. The Manual for Courts-Martial, United States, 1951, paragraph 5a(4), states that action by a commander "which is merely official and in the strict line of duty" will not serve to disqualify him as an accuser. Moreover, we have often proclaimed that the test to be applied is one of "whether the appointing authority was so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter." United States v. Gordon, 1 USCMA 255, 2 CMR 161; United States v. Jewson, 1 USCMA 652, 5 CMR 80; United States v. Grow, 3 USCMA 77, 11 CMR 77. Since the question in each case is one of fact, we must scrutinize the contents of the indorsement in the case at bar and determine its effect in the light of these criteria.

The document in question contains ten numbered paragraphs which, in a general way, purport to outline for trial counsel the procedure to be adopted in the preparation and presentation of the case for the Government. Specifically, the first and second of these inform trial counsel of the nature of the charges against the accused, direct that he "should familiarize" himself with pertinent provisions of the Uniform Code and the Manual, and suggest that he "should make" a brief opening statement relative to the issues to be tried and the manner in which he expects to present his case. Paragraph 3 directs that certain personnel employed by the Government "should be called" to testify concerning the nature of the accused's assignment and the scope of his duties during the period covered by the specifications. There follows a brief description of these duties, together with a statement concerning the whereabouts of certain requisitions used by the accused, "in the event you [trial counsel] desire" to place them in evidence. Paragraphs 4 through 7 contain advice on the subject of which witnesses "should be called" to testify in connection with each specification, the

nature of the testimony which trial counsel could expect to elicit from each, and what documents each should be asked to identify before their introduction in evidence. Paragraph 8 warns that trial counsel "should anticipate" that certain witnesses may refuse to testify on the ground of self-incrimination, and advises him to maintain close coordination with an appropriate representative of the United States Court for the Allied High Commission. Paragraph 9 directs trial counsel to be prepared to submit to the law officer an appropriate request for instructions, and calls his attention to certain decisions of this Court in that connection. The concluding paragraph points out that—if the accused should be found guilty and the defense were to offer matter in extenuation or mitigation—trial counsel "may properly indicate" to the court factors in aggravation. The terminal sentence of this division of the indorsement cautions trial counsel to avoid all reference to matters not fairly within the scope of the evidence.

Does this communication manifest such a state of mind on the part of the convening authority that reasonable men would conclude that he had a personal interest in the prosecution of the case at bar? We are sure that it does not. While the presence of a command line fixes the identity of the person promulgating a directive, its utilization does not, *per se*, indicate a personal interest on the part of the issuing commander in the subject matter thereof. See, United States v. Keith, 3 USCMA 579, 13 CMR 135; United States v. Teel, 4 USCMA 39, 15 CMR 39. It is the substance of the communication — the language in which its provisions are couched, and the circumstances surrounding its publication—which are controlling here.

Read in its entirety, it is abundantly clear that the present indorsement contemplates nothing more than that trial counsel should be informed of the nature of the charges against the accused, of the character and availability of the evidence in support thereof, and of the considered views of the convening authority's legal assistants concerning the

**Headnote 2**

applicable law and the manner in which the case "should" be presented. There is nothing in the document which even remotely suggests that the convening authority, or the members of his staff, had predetermined the issue of the accused's guilt or innocence, nor is there anything which reflects a personal interest on the part of the convening authority in the outcome of the impending trial. The language employed throughout is wholly advisory and not compulsory in spirit. The tenor of the instrument is undeniably instructive, and complete objectivity characterizes both its thought and composition. Required—as we are—to decide whether the action of the convening authority in forwarding such a communication is indicative of a *personal,* as distinguished from an *official,* interest in the prosecution, we do not hesitate to elect the latter category.

Our decisions in United States v. Gordon, supra, and United States v. Marsh, supra—relied upon by the accused—contain nothing which requires us to depart from this conclusion. In the former case, one of several charges pending against the accused at the time of the appointment of the court-martial was an attempted burglary of the home of the convening authority himself. Although the accused was not brought to trial for the commission of this offense, the convening authority was aware, at the time the membership of the court-martial was selected, that the accused had confessed to its perpetration. In Marsh the accused was charged with the willful disobedience of a direct order of the convening authority, who necessarily would possess a personal interest in seeing to it that subordinates did not exhibit disregard for his commands with impunity. Applying the test enunciated in the Gordon case, we had no difficulty in concluding there that the convening authority was "so closely connected with the offense" in each instance as to be disqualified to act in the case. Such a situation does not at all obtain in the case at bar. There is nothing in the present record to show —indeed, it has not been contended by the defense—that General Eddy had the slightest connection with the of-

fenses for which the accused was tried. There is simply no evidence upon which to base a belief that his interest in the case was other than official, or that his action in transmitting the 3d indorsement went beyond the line of strict duty. In these circumstances we are certain that no reasonable person could fairly impute to him a personal interest in the outcome of the litigation.

Nor do we labor under any sort of apprehension that the practice under consideration here necessarily constitutes an insidious manifestation of command control or influence—and we are sensitive indeed to this evil. Certainly there is no want of support for the procedure used here. Paragraph 35c of the Manual, supra, provides that the advice of the staff judge advocate or legal officer shall contain a written statement of his findings with respect to whether the allegation of each offense is warranted by the evidence adduced at the pretrial investigation, plus a memorandum of the action to be taken by the convening authority. It is also provided that a copy of the advice shall accompany the charges if they are referred for trial. In addition, the Legal and Legislative Basis, Manual for Courts-Martial, supra, at page 141, states:

"Although not required by the code or the manual, the advice of the staff judge advocate or legal officer should list the elements of any offense that is to be referred to trial if a detailed statement of the elements of proof of that offense is not in the manual. Such a listing, for example, would be appropriate as to any offense under Article 133 and as to many offenses under Article 134. Similarly, if the trial will involve a question of law the solution to which is not to be found in the manual (e.g., entrapment), the advice may well contain a brief statement of the law in point. Such information will aid the trial counsel in presenting correct proposed instructions if the law officer calls for such instructions. *An alternate solution is to include such information in a separate memorandum addressed to the trial counsel.*" [Emphasis supplied.]

Also significant in this connection is the caveat against possible exposure by trial counsel of papers in his possession relating to the case in hand to the risk of inadvertent examination by members of the court—as well as the attendant injunction that he shall refrain from bringing to the attention of the court any sort of intimation of the views of the convening authority or his staff judge advocate with respect to matters within the jurisdiction of the court. See Manual, supra, paragraph 44g. These admonitions would have been superfluous indeed if trial counsel were not permitted to scrutinize such papers, or were denied access to the views of the convening authority.

Heretofore, our assault on so-called command control has been directed exclusively against instances of unauthorized interference on the part of the convening authority, or his legal assistants, with the functions of members of a court-martial or with the law officer. United States v. Guest, 3 USCMA 147, 11 CMR 147; United States v. Littrice, 3 USCMA 487, 13 CMR 43; United States v. Hunter, 3 USCMA 497, 13 CMR 53; United States v. Knudson, 4 USCMA 587, 16 CMR 161. Certainly there can be no fair trial under the military judicial system unless those who try the facts, and those who rule on questions of law, are permitted to exercise their respective judgments freely and independently—unfettered by the fiats or suggestions of command, and unencumbered by the psychological pressures to which subordinates may otherwise be subject. The overwhelming importance of the utmost impartiality on the part of those who serve as judge and jury in the scheme of military law demands that a high degree of separation be maintained between them and the convening authority. Yet, it is well recognized that—even in the case of the court member and the law officer —the isolation required is not absolute. See United States v. Isbell, 3 USCMA 782, 14 CMR 200.

Much less aloofness necessarily marks the relationship of the trial coun-

sel to the convening authority. Unlike the court member and the law officer, the trial counsel is at least in some degree a partisan, and a functionary charged with the duty of insuring that all competent evidence against an accused person is presented—once the convening authority has decided that trial is warranted. The trial counsel is furnished with a copy of the written advice of the staff judge advocate to the convening authority, on the basis of which the latter reached his decision to refer the case for trial. The trial counsel must—among other matters—report to the convening authority concerning the status of cases at hand, the results of all trials, the possibility of court membership in a particular case being reduced below a quorum, the inadvisability of trial in certain instances, and all substantial irregularities in the charges or appointing orders. Manual, supra, paragraph 44.

Moreover, this Court has inveighed repeatedly against the regrettable practice of submitting cases for decision by court-martial on the barest minimum of available evidence. United States v. McCrary, 1 USCMA 1, 1 CMR 1; United States v. Knoph, 2 USCMA 108, 6 CMR 108; United States v. Wilson, 4 USCMA 3, 15 CMR 3; United States v. Beninate, 4 USCMA 98, 15 CMR 98. Since the responsibility for supervising the orderly and effective administration of military justice rests with the convening authority, he is thus—in many instances—confronted with a choice between the spectre of command control, on the one hand, and the stricture of inadequate presentation, on the other. It is difficult for us to comprehend how he may safely navigate this legal-administrative Scylla and Charybdis unless he is accorded some measure of freedom in advising and instructing prosecution personnel.

This Court has not evidenced unawareness of the threat posed by the command control of judicial proceedings. On the contrary, we have apprehended, unmasked, and condemned its exercise with dispatch — even when manifested in subtle and inchoate forms. Yet our vision is not sufficiently keen to enable us to descry those malign aspects which defense counsel believe to be present in the practice under consideration here. To be sure, situations may well arise in which improper command influence is exerted under the guise of instructions to trial counsel. It is conceivable, of course, that such instructions might at once be so binding and so detailed as to reduce counsel to the likeness of an automaton. In this event a convening authority would both transgress the provisions of Article 37 and deprive the accused of the protections inherent in the requirement that the trial counsel of a general court-martial—as well as his learned friend for the defense—be a duly qualified attorney. Uniform Code, Article 27, 50 USC § 591. Should such a situation exist, we are sure that it would not escape detection and disapprobation by this Court. However, within permissible limits—which we find have not been exceeded in the present case—it would appear that the furnishing of instructions to trial counsel is quite as likely to be helpful as dangerous—almost certainly more so.

Indeed, we are little disposed to be hasty in denominating as pernicious a practice which—to some extent at least —has been fostered by our own decisions. Rather we are constrained to believe that the results of its utilization will more nearly accord with our express wish for the presentation of fully developed cases and the Congressional intent to afford substantial justice to all interests before a court-martial. For these reasons we are of opinion that the transmittal of the 3d indorsement here did not make of the convening authority an accuser nor reflect the exercise of reprehensible command influence. We thus conclude that the first assignment of error is without merit.

V

The second assignment of error is urged by the defense as an alternative to the first. In view of our holding—expressed earlier herein—with respect to the finality of the command line it becomes unnecessary to consider this assignment.

**218**

## VI

The third error assigned by the accused raises the question of whether, in view of their roles in the confection of the challenged indorsement, the Staff Judge Advocate and his assistant could properly review the record of trial in this case. Article 61 of the Code, supra, 50 USC § 648, provides that "The convening authority shall refer the record of every general court-martial to his staff judge advocate or legal officer, who shall submit his written opinion thereon to the convening authority." Here, the allied papers reveal that the written review was prepared by a civilian attorney employed by the Department of the Army. Below his signature appears the legend, "I concur in the foregoing review and adopt it as my own," signed by an Assistant Staff Judge Advocate. Finally there appears the statement, "I concur in the Opinion and Recommendation," followed by the signature of the Staff Judge Advocate. The Government has chosen to place no reliance on the presence of an independent review accomplished solely by civilian counsel, and attempts no argument designed to dissociate the Staff Judge Advocate and his assistant from the actual mechanics of the review procedure. Thus, for the purposes of the present assignment, we shall assume that the first level review was prepared by the last mentioned individuals.

Appellate defense counsel contend that the preparation of the 3d indorsement, containing as it did instructions to trial counsel, so far associated these officers with the prosecution as to disqualify them from thereafter reviewing the record. In this connection, Article 6(c) of the Code, supra, 50 USC § 556, prescribes:

"No person who has acted as member, law officer, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in any case shall subsequently act as a staff judge advocate or legal officer to any reviewing authority upon the same case."

The prohibitions set out in this Article were intended, of course, to insure strict impartiality in the first level review. United States v. Coulter, 3 USCMA 657, 14 CMR 75; United States v. Crunk, 4 USCMA 290, 15 CMR 290. Noticeably absent from the Article's limiting terms, however, is any mention of the staff judge advocate, to whom the case must be referred initially for pretrial recommendation and advice. See Article 34, Uniform Code of Military Justice, 50 USC § 605. In United States v. Thomas, 3 USCMA 798, 14 CMR 216, we had occasion to comment in the following language on this apparently permissible duality of function on the part of the staff judge advocate under Articles 34 and 61:

"For instance, the staff judge advocate of a command must, prior to trial, advise the convening authority concerning the sufficiency of the evidence to support a reference of charges for trial. Code, supra, Article 34, 50 USC § 605. Yet subsequently this selfsame official must submit to the convening authority his written legal opinion dealing with the validity of findings and sentence resulting from the trial on those very charges. Code, supra, Article 61, 50 USC § 648. Congress did not appear to think that the staff judge advocate should be disqualified for his later reviewing function by reason of a prior expression of opinion in connection with reference for trial."

As mentioned earlier in this opinion, paragraph 35c of the Manual, supra—supplementing Article 34 — requires that the advice of the staff judge advocate include a statement as to whether an offense is made out by the expected evidence, as well as a written recommendation of action to be taken by the convening authority. This recommendation must accompany the charges if they are referred to the trial counsel for prosecution. Furthermore, the Legal and Legislative Basis, Manual, supra, provides at page 141 that the advice shall also include a statement of the elements of the offense and the law in point, if not contained in the Manual. It is obvious that, in analyzing the information before him and assessing its sufficiency with an eye to recommending or disapproving reference for trial, the

staff judge advocate must inevitably form some tentative view as to the merits of a particular case. Yet it is equally clear under the Uniform Code that this *prima facie* determination does not preclude his later participation as a reviewer of the trial record. Moreover—as was pointed out by the board of review in the case at bar—if the present instructions had been embodied in the advice forwarded to the convening authority by the command's Staff Judge Advocate and later referred to trial counsel, no one could have contended successfully that the former was for this reason disqualified. We cannot see why the transmittal of identical instruction as an indorsement to the charge sheet should dictate a different result.

Our opinions in United States v. Coulter, supra, and United States v. Crunk, supra, say nothing to the contrary. In the former case, the officer who acted as staff judge advocate to the convening authority was the same person who had previously served as trial counsel in the case. In the latter, it was the law officer at the trial who subsequently participated in the reviewing process. Not only did both of these situations involve overt departures from the express command of the legislature, but in neither did we experience great difficulty in demonstrating the conflict which inescapably exists between the duties devolving upon a staff judge advocate and those imposed upon the trial counsel and the law officer. The natural tendency of trial counsel "to press for a substantial sentence as an accolade for his efforts in securing the conviction" was, we thought, a sufficiently compelling consideration to vitiate the impartiality required of one having in some sense the status of an appellate judge. Also the temptation of a law officer as a reviewer to gloss over possible errors in the interest of causing his trial rulings to be sustained by the convening authority was, we decided, equally disabling.

In the Crunk case we stated that Article 6 (c) was intended to prevent *"a participant at the trial level"* from subsequently advising the convening authority. Obviously the Staff Judge Ad-

vocate and his assistant in the case at bar did not join in the presentation of the cause to the court-martial. Nor does the preparation of the questioned indorsement suffice to establish an adversary relationship between them and the accused. While particularized in some respects, the document contains nothing that a staff judge advocate could not say permissibly in advising the convening authority. And, as previously observed, this advice to a convening authority does not disqualify the former from later participation in the review of the case. The instructions to the trial counsel here do not constitute an outline of trial strategy, but rather an exhortation to effect a full and fair presentation of the evidence. It is also worth noting that—according to the deposition of Colonel Solf—the Staff Judge Advocate of the command concerned and his people were available at all times for consultation by the *defense counsel* relative to problems on which the latter might desire advice in connection with a full presentation of *his* case. This, of course, should always be true.

A line is to be drawn between the permissible and the impermissible in dealing with a convening authority's instructions to members of a court-martial appointed by him—and we have grappled with this problem in the past. See United States v. Littrice, supra. Similarly, a line must be drawn for present purposes between the preparation of the instant document—with its objectivity and its generally laudable goal—and the drafting of a document which seeks to describe in detail the trial tactics most conducive to securing conviction in a particular case regardless of guilt or innocence. Instructions which are on the wrong side of this line will almost inevitably also present transgressions of Articles 27 and 37.

A close analogy to the case at bar is found in United States v. DeAngelis, 3 USCMA 298, 12 CMR 54. There a staff judge advocate was assailed as disqualified to review a record of trial for the reason that he had furnished advice to persons conducting a pretrial investigation. In rejecting this contention, we emphasized the role of the staff judge

advocate as the administrator of military justice, and noted that it would be incongruous were he to be immobilized until charges had been preferred and investigated. We added that *sua sponte* he might lawfully direct the attention of investigators to deficiencies in the evidence secured by them. If this conduct is to be regarded as proper, we see no justification for barring a staff judge advocate from cautioning a trial counsel to avoid possible pitfalls in the presentation of a complete case. Indeed, it is quite conceivable that the accused, as well as the Government, may benefit from such a presentation—just as he may benefit from a thorough investigation of charges against him. Bearing all of this in mind, we hold that the Staff Judge Advocate here was not disqualified from reviewing the record of the accused's trial.

It is to be noted that in dealing with the first three assignments of error in the present case, we have been concerned with several manifestations of what is virtually a single phenomenon for which the law of the civilian community offers no close analogue. In military law, the convening authority— a military commander—refers the case of an accused person for trial; appoints the tribunal which tries him, including the prosecutor and in most instances defense counsel as well; and thereafter takes definitive juristic action with respect to the findings and sentence of the court-martial. Similarly, the staff judge advocate—the convening authority's legal consultant — initially evaluates the expected evidence against one charged with crime; advises the convening authority concerning the legal and other appropriateness of trial; and, in case a court-martial hearing is held, thereafter accords the record of trial its first judicial review. It will be apparent that these dualities of function operate to create special, and often difficult, problems in this Court—principally related to fairness of the proceedings — quite unknown to civilian law.

It has been argued, of course—and vigorously—that the administration of military justice on the general court-martial level should be separated wholly from military command. However, this position does not reflect the legislative view. It is undeniable that Congress had this proposal before it at the time of the enactment of the Uniform Code —and equally clear that its members rejected the scheme. It remains for this Court to deal with difficulties under the current dispensation—just as it would be required to deal with the differing problems of another. Indeed, we must cut our coat in accordance with our cloth. We have sought to perform our task in this particular in no doctrinaire manner but rather—given the Congressional mandate — reasonably, practically, realistically and fairly. We are sure that no departure from this goal will be found in the instant case.

VII

We turn now to the final error assigned by the accused—that having to do with the propriety of the law officer's ruling which permitted certain rebuttal witnesses for the Government to relate specific instances of misconduct on which they based their unfavorable opinions of the accused's character. The following summary will serve to fix the setting in which the challenged testimony was introduced. The accused was a supply and procurement officer attached to the 7714th Engineer Intelligence Group, located at Schwetzingen, Germany. This organization was charged with the preparation and maintenance of maps for all units of what was—at the time in question—the European Command. Procurement of equipment and supplies for the group was effected during this period by the procurement officer of the Heidelberg Military Post. However, it was the duty of the accused to determine the unit requirements of his Group, prepare appropriate specifications, and issue invitations for bids to prospective suppliers. In addition, he examined all bids received and made a preliminary determination of which bidder was best able to supply the necessary supplies and equipment. He would then prepare appropriate purchase requests which were forwarded to the procurement officer at Heidelberg. The latter, in turn, would issue requi-

sition demands to effect procurement of the specified goods, followed by a requisition receipt authorizing payment to the supplier. Although the procurement officer at Heidelberg possessed final authority to make all awards, he depended in large measure perforce on the recommendations made to him by the accused.

In the case at bar, Captain Haimson was charged with having solicited and received bribes from various German firms which were frequently awarded orders on his recommendation. In support of these charges, the Government introduced evidence sufficient to sustain the conviction from which the accused has now appealed. Included was the testimony of three German contractors —Messrs. Willersinn, Schneider, and Schumacher—who stated that they had made payments to him based on an agreed percentage of the value of the orders filled. This testimony was accompanied by written account records reflecting payments actually made. The accused took the stand in his own behalf and specifically denied having sought or received such payments from local firms at any time. Toward the close of his case, he presented witnesses who testified to his good character and veracity. These witnesses testified concerning their relations with the accused and their opportunities for forming an opinion of his character and integrity. Thereafter, they stated their favorable opinions of him in respect of these qualities, and acknowledged that they would gladly believe him under oath. In addition, the accused introduced through stipulation and otherwise statements from certain of his superiors concerning his military efficiency and conduct, as well as extracts from his service record, including letters of commendation and reports of qualification for promotion.

In rebuttal, the Government introduced, *inter alia*, the testimony of two officers who had formerly served in a subordinate echelon of the command to which the accused was assigned. One of them testified that in late 1950, he "came to the conclusion that his [the accused's] integrity was in question," and the other that "there were times

when I had grave doubts about Captain Haimson's honesty." In addition—and over repeated objection by defense counsel—each was permitted to recite certain incidents which led the witness to his unfavorable character conclusion. In the main, these incidents antedated the period covered by the specifications in suit. Both witnesses stated that they had brought one of the matters in question to the attention of a Colonel Johnson, the accused's superior officer, but had been sharply criticized by the Colonel for making damaging assertions without adequate foundation.

The current Manual for Courts-Martial permits proof of character not only by means of reputation evidence, but also through reliance on the opinions of witnesses first shown to have enjoyed a sufficiently close acquaintance or relationship with the person in question to justify the formation of a reliable judgment. Manual, supra, paragraph 138f (1). This provision represents a clear departure from the antecedent military rule—as well as the prevailing civilian principle—under which character may only be established by evidence of reputation in the community. See Manual for Courts-Martial, U. S. Army, 1949, paragraphs 125b, 139b; Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 213; United States v. Michelson, 335 US 469, 93 L ed 168, 69 S Ct 213; Wigmore, Evidence, 3d ed, §§ 1608–1622, 1980–6.

Under the practice obtaining prior to the promulgation of the 1951 Manual, rebuttal witnesses for the prosecution were prohibited from relating specific acts of misconduct on which a bad reputation was based. Cf. United States v. Gould, 47 BR 29, 71. In view of the overwhelming authority and sound reason supportive of this latter proposition, we are constrained to believe that —although the framers of the Manual chose to alter the previous rule, which rejected opinion evidence for a character purpose—they did not intend thereby to overturn also the well-established principle prohibiting the demonstration of bad character through the use of specific acts of misconduct.

With respect to the use of such acts to show an accused's bad character, Dean Wigmore has declared:

"The law here declares a general and absolute rule of exclusion. It is *forbidden,* in showing that the defendant has not the good character which he affirms, *to resort to particular acts of misconduct by him.*" [Emphasis partially supplied. Wigmore, Evidence, 3d ed, § 193.]

See also, Eley v. United States, 117 F 2d 526 (CA6th Cir); Zirkle v. Commonwealth, 189 Va 862, 55 SE2d 24; Carroll v. State, 77 Ga App 251, 48 SE 2d 491; 20 Am Jur, Evidence, § 326, page 305; Wharton, Criminal Evidence, § 337.

It was early stated, and has often been reaffirmed, that—despite the obvious utility of such testimony—compelling reasons of auxiliary policy demand its exclusion. Its tendency to provide the triers of fact with an extraneous ethical justification for conviction in disregard of the evidence—or lack of it—in a given case, subjects its use to reprobation as a source of danger. Moreover, the probable inability of an accused—arraigned on specific charges—to be prepared to disprove or justify every act of alleged misconduct with which he may be charged, or which he may at some time have committed, early produced condemnation of this sort of testimony on the ground of undue surprise. Furthermore—and from the point of view of the effective administration of justice —the introduction of such testimony tends unquestionably to multiply and confuse the issues, and to withdraw the minds of the jurors from evidence relating directly to the guilt or innocence of the accused. Clearly, these reasons of policy are applicable with equal force regardless of whether the accepted mode of demonstrating character be opinion evidence, reputation evidence, or both. It is not without significance in this connection that Dean Wigmore states that the rule of exclusion of specific acts "is so firmly established that it would be held to prevail even in jurisdictions where no express enunciation of it has been made." Wigmore, supra, § 194.

## VIII

The acceptance of the challenged testimony has been strongly defended by Government counsel on the ground of waiver. Initially they rely on the circumstance that the defense, after objecting strenuously to the prosecution's rebuttal, nonetheless cross-examined its rebuttal witnesses with vigor, and thereafter returned the accused to the stand to refute them. There is doubtless authority for the position that the defense objection afforded an adequate protection to Captain Haimson, and that—when affirmative evidence bearing on the same incidents was offered thereafter—he waived the right to object in this Court. However, we are unwilling to hold the defense to an "all or nothing" reliance on the soundness of its objection in the present sort of situation, and cannot agree that the accused should be compelled to entrust the correction of the error to the sometimes untender mercies of reviewing authorities—with, at best, the concomitant necessity to undergo a rehearing. We are sure that in electing the course he chose, the accused did not intend thereby "to fight this issue out at the trial level"—as the Government contends—and to forfeit the right to have the law officer's admissibility ruling reviewed on appeal.[1]

Government counsel also argue that

---

[1] It is also clear that the accused did not waive this same right by his failure to enter a motion to strike the offending testimony. **Headnote 7** It is indeed true that defense counsel at the trial originally objected to the evidence in question on the basis of the hearsay rule—and not for the reason that it constituted an unallowable showing of bad character through particular acts of misconduct. Shortly thereafter, however, an objection grounded on this latter theory *was* interposed—and as promptly overruled by the law officer. A reading of the record convinces us fully that this second effort would have been rejected with equal alacrity had it been lodged in the first instance. In any event, and in view of the law officer's explicit

—by the means through which he sought to establish his own good character—the accused waived all right to object to the prosecution's use in rebuttal of instances of prior misconduct on his part. The Government position here may be reduced to the following propositions: (1) that the accused had utilized evidence of specific acts of exemplary conduct to establish his own good character; (2) that evidence of this nature is normally inadmissible prior to findings; and (3) that the use of this inadmissible evidence opened the door to refutation through a showing of particular acts of misconduct, which otherwise would be inadmissible. Fortunately we are not required to pass finally on any of these contentions, for we have concluded that—quite apart from the character problem—the so-called rebuttal evidence was admissible. To demonstrate this, we must present further details of the trial's events.[2]

When the accused took the stand in the course of the defense's case, he was cross-examined concerning certain transactions in deutsch marks. According to Captain Haimson, whatever marks he had possessed had been obtained through exchanges of the military scrip he had received as military pay and allowances. This matter was inquired into for the purpose of demonstrating that the accused had possessed inexplicably large sums in marks—which probably came from the German suppliers who allegedly had bribed him.

Other questions directed to him concerned a certain Captain Wise and one Lieutenant Greenbaum—and related to whether either of these individuals had at any time refused to sign receiving reports covering items procured for the 7714 Engineer Group by Haimson. The accused was also asked whether on any occasion he had signed such a report in the name of Captain Wise because of the latter's refusal to do so. He was interrogated further concerning certain unusual features of the documentation of transactions with Messrs. Willersinn and Schneider, two of the German contractors involved here.

Captain Wise took the stand and sought to support his low opinion of

rulings in the matter, defense counsel was under no sort of duty to move to strike at the conclusion of all evidence on the point—since, as he well knew, such a motion would unquestionably have been denied.

[2] Concerning the second proposition we entertain little doubt. The general rule is that specific prior **Headnote 8** acts may not come in to show the good character of a defendant. Wigmore, supra, § 195; United States v. Shapiro, 159 F2d 890 (CA2d Cir), aff'd 335 US 1, 92 L ed 1787, 68 S Ct 1375; Perez v. State, 153 Tex Cr 223, 221 SW2d 915. Concededly this rule should be much less rigidly applied in military law administration than elsewhere, in view of the reception of opinion testimony of good character. Wigmore, supra, § 195. And a law officer should not be criticized for adopting a liberal view concerning the sort of evidence which may be utilized to evince good character. Manual, supra, paragraph 138ƒ(2). Also, of course, after findings have been returned an entirely different principle governs. Manual, supra, paragraph 75c(4).

The Government's third proposition involves what Dean Wigmore has termed "curative admissibility." Wig-

**224**

more, Evidence, 3d ed, § 15. Cf. United States v. Regents of New Mexico School of Mines, 185 F2d 389 (CA10th Cir); Crawford v. United States, 198 F2d 976 (CA DC Cir). In the present setting the principle urged by the Government receives a certain amount of support from the Manual's statement that "character evidence in rebuttal which may properly be received will be limited by the scope of the character evidence introduced by the accused." Paragraph 138ƒ(2). And in like vein Colonel Winthrop long ago suggested that "Rebutting evidence of bad character, in military cases, may be of similar form and nature to the evidence introduced of good character." Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 352.

However, we are not required to pass on the applicability of the notion of "curative admissibility" to the case at bar; nor need we decide the more difficult question of whether the defense evidence here did in fact conform to the Government's characterization of it as a vehicle for the proof of specific favorable acts. Instead, we have concluded that—apart from any question of character—the rebuttal evidence was admissible.

the accused's integrity by the use of specific examples. The first of these related to a receiving report covering items coming from Willersinn, and bearing date of December 15, 1950. This document had been transmitted by the accused to Captain Wise for his signature following the purchase of thirteen gasoline can racks for the former's unit. The items specified in the body of the report were described as "metal holder[s] for topographical equipment with straps and hol-plates." Captain Wise testified that the items in fact received amounted to nothing more than the ordinary gasoline can racks in common use on United States military vehicles; that they were in very poor condition; that the description contained in the body of the report was completely inaccurate; and that there was no item of equipment known to him corresponding to the nomenclature used in the report. In addition, he stated that for these reasons, and also because the price listed therein—approximately $7 per unit—was so grossly in excess of that at which similar surplus items were listed in the Ordnance Catalogue —approximately $1.70 per unit—he declined to sign the voucher. Subsequently—as revealed by the report itself—Captain Haimson signed the document for Wise. According to the latter, at no time had he authorized this action by the accused. Captain Wise conceded that he had been criticized by Colonel Johnson—his and the accused's commanding officer—by reason of the accusations he had made against Haimson in connection with the incident just described.

This witness also recited the details of another incident, originally brought to his attention by Lieutenant Greenbaum, in which a matter of excessive billing was involved. In this connection it appeared that certain field chests for carrying gas masks had been built. Although he did not himself measure the dimensions of these items, Captain Wise testified that he did inspect them, and that it was obvious at a glance that the amount of construction material indicated in the receiving report exceeded by far that incorporated in the boxes. Apparently this incident transpired soon after the one mentioned earlier, and—although the record does not reveal clearly which supplier was involved —the goods with which the report dealt were of a type frequently furnished by Willersinn.[3]

Lieutenant Greenbaum was next called to the stand, and—after expressing doubt concerning the accused's honesty—launched into an account of specific incidents which had served to produce that opinion. Two of these had to do with the receiving reports about which Captain Wise had testified earlier. With respect to the first, Lieutenant Greenbaum's recitation was in substantial accord with that of Captain Wise. In addition, Greenbaum testified that, in Colonel Johnson's absence, he had been called to Captain Haimson's office and—although he indicated objection to the nomenclature employed in the report—had been ordered by Haimson to place his signature thereon. The Lieutenant stated that he refused to do so and that he did not know who had ultimately signed for the items. He mentioned, however, that the receiving report with respect to which Captain Wise had testified—and which had been introduced in evidence by the Government—was identical, save as to signature, with that which he had declined to sign. Concerning the second incident, Lieutenant Greenbaum testified that, following receipt of the chests referred to by Captain Wise, he had per-

[3] Another instance of a questionable nature was recited by this witness which is hardly material to the instant problem and requires but slight attention. Captain Wise also sought to recount a conversation with the son of Willersinn, the contractor. However, the law officer properly prevented the presentation of the details of this verbal exchange. Thus the members of the court were simply made aware that in some degree the poor opinion of Haimson entertained by Wise stemmed from an interview with Willersinn's son. While error was doubtless committed in permitting even slight reference to this conversation as a basis for the witness' opinion of the accused's character, the impact of the evidence must necessarily have been so insignificant as to render further consideration of the matter unnecessary.

sonally measured them, and had discovered that only one-half of the material specified in the receiving report had been utilized in their manufacture.

An additional incident was related by this witness which occurred in "the spring or summer of 1951" when auditors were examining certain procurement accounts. It appears that on this occasion Greenbaum was sent a substantial number of receiving reports which he was requested to sign and return immediately. Having no knowledge of the accuracy of their contents, he placed them in his "hold basket" until such time as he might find an opportunity to check them thoroughly. He was subsequently sought out by Captain Haimson, who informed the witness that he wished the vouchers returned immediately; that he (Haimson) knew that the goods had been delivered; and that Lieutenant Greenbaum must sign for the items forthwith. Again—Greenbaum indicated—he had refused to sign and stated that he was unaware of who had finally done so.

## IX

Pertinent to the testimony of Wise and Greenbaum is paragraph 138*g* of the Manual which contains ▬▬ language having to do with the admissibility of evidence of other offenses or acts of mis-

conduct on the part of an accused. Unfortunately that language is arguably ambiguous. It states *inter alia:*

". . . However, if evidence of other offenses or acts of misconduct of the accused has substantial value as tending to prove something other than a fact to be inferred from the disposition of the accused, the reason for excluding the evidence is not applicable."

But continues by stating that:

". . . Consequently, evidence of other offenses or acts of misconduct of the accused is admissible in the following circumstances: . . ."

Five such circumstances are thereafter set down, which may be summarized as identity, plan or design, knowledge or intent, motive, and finally refutation of accident or mistake.

The principal ambiguity in paragraph 138*g* is suggested by the following inquiry: Was the enumeration of the five examples reported in the preceding paragraph meant by the framers of the Manual to constitute an exhaustive enumeration or merely an illustrative one? This question reflects an indecision manifested by both American and British civilian courts respecting the rule to be applied in the admission of evidence of prior misconduct.[4] In any

---

[4] One distinguished writer has analyzed the precedents closely and has concluded that the "original rule" in this area **Headnote 10** clearly held evidence of past misconduct to be *admissible if* it possessed relevance other than through the establishment of bad criminal traits—that is, a bad disposition on the part of the accused. At a later time, however—this authority reports —a "spurious rule" came to be voiced by a number of courts to the effect that evidence of acts of misconduct is *inadmissible unless* it may be brought within certain specific categories of relevance similar to the five presented in the Manual and set out in the preceding paragraph. See Stone, The Rule of Exclusion of Similar Fact Evidence: America, 51 Harv LR 988 (1938); Stone, The Rule of Exclusion of Similar Fact Evidence: England, 46 Harv LR 954 (1933). See also Hale, Some Com-

ments on Character Evidence and Related Topics, 22 S Cal LR 341 (1949).

Criticism of the "spurious rule" may be expressed on several grounds. For instance—it may be asked—why is relevance which can be brought within the five categories set out in the Manual to be accorded a higher place than that which falls outside them? After all, an accused is on notice to defend against *all* matters relevant to the charges against him. Further, it would appear that simplicity is in no way introduced through discarding the older and more general criterion and substituting therefor the measuring rod of specific categories. Finally, as has been repeatedly suggested, no accused person is entitled to the exclusion of relevant evidence simply because it reveals the existence of other criminal conduct. Otherwise, the more completely criminal a defendant may be, the less the evidence which may come in against him—

event, we are convinced that the testimony under consideration here falls properly within the purview of the specific exception which permits the introduction of evidence tending to show the existence of a plan, design or scheme on the part of an accused embracing the offenses with the commission of which he is charged. Concerning this particular exception, 20 Am Jur, Evidence, § 314, page 296, speaks as follows:

"Evidence of other crimes is competent in a criminal trial to prove the specific crime charged when it tends to establish a common scheme, plan, or system embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, notwithstanding the general rule excluding evidence which shows, or tends to show, that the accused has committed another crime wholly independent of that for which he is on trial. In other words, the law permits proof of a plan or scheme to commit a series of crimes including the one for which the accused is being tried, and, *as tending to show the existence of such plan or scheme, it allows testimony of the commission of crimes other than the one charged, but so related in character, time, and place of commission as to tend to support the conclusion that there was a plan or system which embraced both them and the crime which is charged."* [Italics supplied.]

Initially it must be borne in mind that the accused here was not charged with the *unilateral* commission of a *single* offense. On the contrary, the specifications under which he was tried alleged thirteen instances of soliciting and receiving bribes from German suppliers. It was the clear theory of the Government's case that a conspiracy had existed between these suppliers and the accused which contemplated the making of specific payments by the former to the latter in return for his assistance in securing military contracts for them. In support of the various specifications, the individual contractors involved testified that they had entered into an agreement with the accused, by the terms of which they were to pay to him a fixed percentage of the total value of the orders they received. Thus it is manifest that, at the very outset, the prosecution's case depended on establishing the existence of an illicit, consensual scheme designed to enrich the parties thereto at the expense of the Government.

The contractor most clearly involved in the incidents related in the challenged testimony was Willersinn, and

---

to the point, perhaps, where one might become wholly immune were his crimes so numerous that proof of the one charged is impossible without a showing of others uncharged. See Wigmore, supra, § 216. While this last objection may be obviated in most instances—and especially under the more liberal military practice—by the preference and consolidation of charges for all violations suggested by the evidence, it is hardly desirable from any standpoint to compel prosecution under a galaxy of charges as a prerequisite to the introduction of all of the relevant evidence.

Thus the "original rule" mentioned earlier seems superior—a view which careful study indicates to have been entertained by Dean Wigmore. See Wigmore, supra, §§ 215–16. Moreover, the American Law Institute in its Model Code of Evidence has chosen to espouse the same doctrine, and to deny the need for seeking to predicate the admissibility of particular acts on the existence of specific categories of relevance. See American Law Institute, Model Code of Evidence, Rule 311. And the same is true of the Uniform Code of Evidence recently promulgated by the National Conference of Commissioners on Uniform State Laws. See Uniform Rules of Evidence, Rule 55 and Comment.

In light of these authorities, and in conformity with recent precedents, we might in a proper case elect to resolve whatever latent ambiguity may be found in paragraph 138*g* in favor of the broader rule of admissibility. People v. Woods, 35 Cal2d 504, 218 P2d 981; State v. Scott, 111 Utah 9, 175 P2d 1016. This choice would seem especially appropriate in military law, since the basic—and expressed—purpose of paragraph 138*g* is to exclude only that evidence which tends solely to show a bad disposition on an accused's part, and perhaps conversely to admit that which is relevant in any other way.

it is to be observed that two of the specifications alleged that the accused received bribes from him. One charged the receipt of some 10,838 deutsch marks during the period extending from approximately February 28 to about December 31, 1951, and the other the receipt of 20,474 deutsch marks sometime between January 14 and August 31, 1952. Willersinn himself testified regarding the arrangement under which Captain Haimson was to obtain a percentage of the former's contract proceeds.

In light of the testimony of the several suppliers—individuals who were to all intents and purposes coconspirators of the accused—it strikes us that the challenged evidence logically tends to show the existence of the illegal scheme. The most significant incident shown by the two rebuttal witnesses had to do with the purchase of gasoline can racks from Willersinn on or about December 15, 1950. On this point the questioned testimony distinctly tended to establish that the accused had deliberately misdescribed certain relatively inexpensive war surplus items in common use and of poor condition, labeling them with more impressive—even nonexistent—nomenclature, in an attempt to increase the price to be paid the contractor for them. To the same effect was the testimony relating to excessive billing for materials supposedly utilized in the construction of gas-mask chests or boxes. Although, as has been pointed out, the testimony in this latter instance did not disclose the identity of the supplier, the items involved were ones which could well have been furnished by either Willersinn or Schneider.

Moreover, the zeal exhibited by the accused in his efforts to obtain the validating signatures of the two witnesses on the first receiving report—even after discrepancies had been called to his attention—tends strongly to support the conclusion that he was well aware of the suggested inaccuracies in price and description. This conclusion is reinforced by the testimony of Lieutenant Greenbaum to the effect that the accused attempted to rely on his superior military grade to compel com-

pliance with his desire to obtain an appropriate signature—and additionally by the evidence that he personally signed the report when even that extreme measure proved unavailing. The incident related to Captain Haimson's conduct during the auditors' inspection has similar significance. The undue haste demonstrated on this occasion in the endeavor to secure Greenbaum's signature on certain receiving reports without verification unquestionably supports an inference that he was eager to forestall close scrutiny of the reports concerned, and thus to convince the auditors that his accounts were in order.

On careful analysis, it is manifest that the evidence in question tends to corroborate the direct testimony of the German contractors. Cf. Schwartz v. United States, 160 F2d 718 (CA9th Cir). According to them, Captain Haimson had entered into an arrangement whereby he was to receive a certain percentage of their gross sales. Naturally any action on his part which would result in an overcharge to the Government by the suppliers would enhance their profits, and—as his return was scaled to theirs—his own as well. The occurrence of a series of unusual events involving misdescription and excessive billing is highly relevant in establishing that a scheme of the nature outlined by the contractors actually existed. Equally relevant is the testimony tending to show an unreasonable eagerness on the part of the accused to obtain the necessary signatures of the rebuttal witnesses, and thereby to accord his records the appearance of authenticity. Moreover, the evidence suggesting an actual falsification of signatures on official vouchers by Haimson is susceptible of the inference that such conduct was intended to conceal the existence of an illegal plot.

When viewed in this light, it is apparent that the several instances of misconduct bear a logical relevance to that charged, and are so closely connected with the latter as to be considered individual steps in a plan or system of illicit activity. United States v. Tuffanelli, 131 F2d 890 (CA7th Cir);

**228**

United States v. Sebo, 101 F2d 889 (CA 7th Cir). Thus, proof of the former would possess a strong tendency to establish the commission of the specific offenses alleged on the charge sheet. Tomlinson v. United States, 93 F2d 652 (CA DC Cir), cert den 303 US 646, 82 L ed 1107, 58 S Ct 645; Am Jur, supra. Of course, the incidents related by the prosecution's rebuttal witnesses would not constitute acts of misconduct in any true sense, and would exercise no rational effect on the findings, unless they were believed to involve an intentional misdescription and overpricing of the goods received, and a deliberate attempt to conceal this conduct as part of an illegal agreement with German suppliers. If the members of the court-martial did so construe them, it would not have been unreasonable for them to have concluded as well that they meshed completely with the contention that the accused had received bribes as alleged in the specifications. Certainly the more numerous the suspicious episodes, the more compelling the inference of wrongful purpose. In our view the ones before us here were sufficiently numerous —and sufficiently suspicious—to justify their consideration by the court-martial.

From this standpoint it is clear that the defense's objection to the admission of the challenged testimony on the ground that the events in question antedated those alleged in the specifications is wholly without merit. It was the Government's contention throughout that the crimes with which the accused was charged were the result of a conspiracy with contractors entered into in advance of the dates appearing in the specifications. Thus it was clearly open to the prosecution to produce evidence tending to show the inception of a criminal plan prior to the time of the offenses alleged. United States v. Crowe, 188 F2d 209 (CA7th Cir); cf. Alford v. Territory of Hawaii, 205 F2d 616 (CA9th Cir).

Moreover, after Willersinn had testified on direct examination, defense counsel sought to impeach his testimony by introducing a receipt given by him to Haimson and reflecting payment for work done at the latter's behest. This instrument was dated September 7, 1950—well before the events in suit—and bore the legend "Amount received with thanks" over the stamped signature of the witness. On cross-examination, Willersinn stated that the money had not actually been received, but that he had set off the amount of the bill against commissions then due Haimson under the terms of their arrangement. While this document was intended to show a deliberate falsification by Willersinn of his records—or at least to indicate inaccuracies therein —it tended indirectly to negate the existence of the conspiracy to which Willersinn had testified. Also, the accused extended the inquiry to include events even earlier than September 1950 by stating on direct examination that no payments had been received from Willersinn in either 1950, 1951, or 1952. Under such circumstances the defense may not be heard to complain of the Government's introduction of evidence of a contrary import concerning events transpiring in December 1950.

Nor are we disturbed by the fact that the testimony of the prosecution's rebuttal witnesses tended to show the commission of offenses of a nature slightly different from those alleged in the specifications—that is, offenses which do not necessarily constitute other acts of bribery. As was aptly said by Chief Judge Parker in Lovely v. United States, 169 F2d 386 (CA4th Cir):

"To bring evidence of other offenses within this rule, the test is not whether they have certain elements in common with the crime charged, but whether they tend to establish a preconceived plan which resulted in the commission of that crime."

Indeed, one scholarly writer recently took occasion to criticize the tendency of courts to seek out legal precedent on which to sustain the introduction of evidence in this field, as a substitute for demonstrating the logical relevance of the proffered evidence in the individ-

**229**

ual case. See, Trautman: Logical and Legal Relevancy—A Conflict in Theory, 5 Vand LR 385. Finally in this connection, the weight to be accorded the testimony in question, the probability that the triers of fact will draw the inferences proposed, and the circumstance that the accused presented rebuttal testimony tending to explain the incidents and to justify his conduct therein are considerations of no moment whatever in assessing the *relevancy* of the evidence for the purpose of determining its admissibility. We thus hold that the challenged testimony in the case at bar was properly admissible to show the existence of a plan or scheme embracing the offenses for the commission of which the accused was tried.

## X

The accused had earlier denied the occurrence of one of the incidents about which Greenbaum and Wise testified. Normally a witness—even an accused—may not be impeached by extrinsic evidence on a collateral point. However, the incident reported by the two officers as rebuttal witnesses was not collateral, since—as we have just seen—it tended to show an overriding criminal plan of which the crimes alleged against Captain Haimson were a part. Thus, the members of the court were entitled to weigh the incident as impeaching the accused's veracity. See Wigmore, supra, §§ 1003, 1004.

Indeed, certain Federal decisions grant an even broader scope to impeachment. In Walder v. United States, 201 F2d 715 (CA 8th Cir), *aff'd* 347 US 62, 98 L ed 503, 74 S Ct 354, the defendant was charged with the sale of narcotics on specified dates. On direct examination, he testified that he had never illegally possessed or sold narcotics *at any time*. It was there held that the Government might properly introduce evidence to refute this statement by showing that the defendant had been guilty of illegal possession at a time other than that encompassed in the indictment. Another case goes so far as to permit the refutation by extrinsic evidence of statements on collateral

matters made by the accused on cross-examination. Dowling Bros. Distilling Co. v. United States, 153 F2d 353 (CA 6th Cir), *cert den* 328 US 848, 90 L ed 1622, 66 S Ct 1120, *reh den* 329 US 820, 91 L ed 698, 67 S Ct 29. Within the thrust of these cases it is distinctly arguable that—irrespective of relevance to show plan or scheme—extrinsic evidence of misconduct denied in sworn testimony by an accused who, like Captain Haimson, sought to show his good character for truth and veracity would be admissible.

The general rule that an accused may not be impeached by extrinsic evidence of misconduct collateral to the case before the court is grounded on the notion that an accused will not ordinarily be prepared readily to refute with testimony every possible claim of misconduct by him during his life, without limitation as to subject matter or time. A similar general policy of exclusion buttresses the doctrine that good character cannot be assailed by evidence of specific misdeeds. The use of extrinsic evidence of misconduct to impeach an accused's testimony, if that evidence is *not* collateral to the main issues of the case, is permitted on the ground that an accused is from the outset required to defend against *all* evidence relevant to the issues of the trial, and which could be introduced on the Government's case in chief. Wigmore, supra, §§ 1002–3.

Now similarly, if, as here, the evidence of prior misconduct is relevant to the charges as showing plan, intent, or the like, may the accused justly complain if that action is also considered by the trier of fact in weighing his claim of good character? Such evidence would have been admissible here regardless of whether Haimson's character was in issue, and thus no surprise to the accused is involved in requiring him to defend against it. It is not demanded that he have available for refutation purposes any sort of proof not required for the defense of his case —quite apart from the question of character. No injection of new issues is present—for the occurrence of the offered misconduct could in any event

230

have been made an issue by the prosecution as tending to show the accused's criminal plan. The analogy is plain to the rule that extrinsic evidence of misconduct, not collateral to the charge being tried, may properly be used to impeach an accused.

And so we hold that the testimony of Wise and Greenbaum as to specific misconduct could, in light of its other relevance to the matters considered by the court-martial, also be taken into account by its members in passing on the accused's claim of good character. Accordingly, we perceive no prejudice resulting from the circumstance that the law officer appeared to misconceive the fundamental source of admissibility of the evidence of specific misdeeds not alleged in the specifications.[5]

The only instruction to which the accused was entitled would have been one to the effect that the members of the court might not permissibly consider the evidence of specific misconduct as showing an evil disposition, or criminal propensity, on the accused's part, and from the fact of that disposition infer that he had committed the offenses alleged. Such an instruction would certainly have been appropriate. But the law officer—we are equally sure —was under no duty *sua sponte* to charge the court regarding this aspect of evidence. The burden of requesting such an instruction rested on defense counsel. Cf. United States v. Johnson, 3 USCMA 709, 14 CMR 127; United States v. Schumacher, 2 USCMA 134, 7 CMR 10.

XI

In conclusion we note that the board of review and the staff judge advocate

rested their affirming action on that notion that—conceding error— ror—the evidence of prior misconduct could not possibly have prejudiced the accused materially. A careful reading of all of the testimony reveals the correctness of this view—which we adopt as an alternative ground for our holding on the last assignment of error.

The record shows that, in answer to questions by court members, the accused maintained firmly that he had acquired deutsch marks for his personal use during the period in question primarily through the exchange of military scrip at various specified banks in nearby cities. The only other deutsch mark source alluded to by the accused related to the relatively insignificant sums which his wife derived through selling used clothing to German second-hand stores. Of its own motion the court requested that the financial records of these institutions be examined —with the gravely damaging result that testimony based thereon failed to reveal a single transaction in which the accused, or his wife, had converted scrip into marks during this period.

In view of the fact that this particular line of inquiry—initiated by the court—was fully developed by questions put by its own members, and the falsity of the accused's statements fully demonstrated, we have little hesitancy in concluding that it was this attempted deception by the accused which primarily undercut his defense. This, together with the compelling case offered by the Government, causes us to doubt the likelihood of material prejudice— conceding arguendo the presence of error. United States v. Chiarella, 184 F2d 903 (CA2d Cir); Allen v. United

[5] In line with this conclusion is a consideration of the situation which would have existed had the rebuttal witnesses first testified to the specific acts of misconduct and thereafter to their opinion of the accused's character. The acts would have been admissible in evidence, and the opinion likewise would have been proper. Under these circumstances, would the accused have been either benefited or harmed by the court's learning from the witnesses that their low appraisal of the accused's character was based solely on these incidents about which the court had already received evidence—and not on some other misconduct on his part about which they had not testified? The answer seems obvious. And this answer signifies that the accused was not harmed here simply because the witnesses first gave their opinion of the accused and only later related the incidents which had provoked that opinion.

States, 26 F2d 246 (CA6th Cir); United States v. Wexler, 79 F2d 526 (CA2d Cir), *cert den* 297 US 703, 80 L ed 991, 56 S Ct 384.

## XII

It follows from what we have said that the decision of the board of review must be affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

My reservations in this case do not arise from doubts concerning the general principles announced by the author judge. I am troubled only with the application of the rule which permits specific acts of conduct to be shown if they have substantial value as tending to prove a plan or scheme. I do not care to expound my concepts at length, as I find no appreciable impact of any error on the findings or sentence. But I call attention to the principle that we should not support a ruling of the law officer on a changed theory unless we test our rule at his level. A trial may become unfair if testimony admitted by him for one purpose is used by us for a different purpose, unsuspected by him and by the parties to the litigation. If we seek to apply different conditions for the admissibility of evidence than were applied by the law officer, we must make certain that all of the testimony which was admitted by him is competent, relevant, and material for the use we make of it. In the instant case I question the Court's contention that all of the evidence about which the accused complains meets the test of admissibility to prove a plan or scheme on his part. I prefer, therefore, to join with the board of review and hold that the law officer erred.

In view of the fact that I concur with the views expressed in the Court's opinion .that, assuming error, the totality of evidence erroneously admitted by the law officer was nonprejudicial, a fortiori, the evidence I find improperly received would have the same lack of measurable impact on the findings and sentence.