UNITED STATES, Appellee

v.

CHARLES H. WILLIAMS, Private E-2,
U. S. Army, Appellant

5 USCMA 406, 18 CMR 30

No. 5228

Decided January 14, 1955

Lt Col Harley A. Lanning, U. S. Army, Maj Edwin Doran, U. S.
Army, and 1st Lt Justin L. Vigdor, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, Lt Col Thomas J. Newton,
U. S. Army, 1st Lt Richard F. Ralph, U. S. Army, and 1st Lt Benjamin
C. Flannagan, U. S. Army, for Appellee.

GEORGE W. LATIMER, Judge:

This accused was charged with wrongfully having in his possession a quantity of a habit-forming narcotic drug, to wit, morphine compound, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. A general court-martial returned a finding of guilty, and thereafter sentenced him to a dishonorable discharge, total forfeitures, and confinement at hard labor for five years. The convening authority later reduced the period of confinement to three years, but otherwise approved the sentence. Subsequently, a board of review approved both the findings and the sentence as affirmed by the reviewing officer. We granted review to determine whether testimony prejudicial to the accused was improperly received in evidence.

The events which gave rise to the charge, as well as the alleged error, are these: On October 22, 1953, at about 9:00 p.m., military investigators, in conjunction with Korean National Police, raided a native dwelling located at No. 39, Cho Pho Dong, Pusan, Korea, then known to be the locale of a narcotics cell. This raiding party, approximately ten in number, took into custody some eighteen individuals. One of the persons apprehended was searched by Agent Hundley of the Criminal Investigation Detachment. This suspect identified himself as "Williams, 551 MP Company." Found well hidden in his fatigue trousers was a small white triangular shaped paper packet, the contents of which were revealed, upon chemical analysis, to be a morphine compound. After discovery of the packet, the suspect broke the agent's grasp, ran through a nearby partially filled sewage ditch and eluded two pursuing officers. However, the searching agent, having been informed by the suspect of his name and organization, repaired to the organization area. There were two soldiers in the unit by the surname of Williams, but when the first was contacted he was found not to be the serviceman who was under suspicion. The agent then determined the location of the other soldier's bunk,

and because of his absence, waited there. In due time, the accused returned to his sleeping quarters where he was immediately recognized as the offender and taken into custody.

Two enlisted men, testifying on behalf of the accused, related that they had been with him at a service club earlier on the day in question; that at about 8:30 p.m. the three left the club; that the accused left their company as they went out of the service club gate asserting that he was returning to his organization; that they proceeded to the Korean dwelling and arrived while it was being raided; that they were there taken into custody and searched without avail; and that they did not see the accused at the dwelling before, during, or after the raid.

In furtherance of his own defense, the petitioner took the stand and related in substance that after leaving the service club he left his companions and started for camp. However, he missed his bus connection and consequently walked from the club to a place identified as Masan Circle. There, he watched a small fire and then he obtained a ride in a military police jeep to his company area. While getting into this vehicle he dropped his cap in a pool of muddy water and then attempted to dry the headgear by rubbing it on his trousers. In this manner he accounts for his wet, muddy, and disheveled condition when finally taken into custody by the narcotic agents. During his direct examination, he categorically denied having been in, or gone to, the raided Korean house on the night in question. It was during cross-examination that, for the first time, he was asked if he was familiar with the area surrounding the place raided. His negative answer to this question resulted in a further probe as to whether or not he was familiar with the general geographic area then under discussion. Again he asserted his unfamiliarity with the questionable surroundings, and he was then interrogated to ascertain whether he had not been apprehended previously in this same area and, at the time of his apprehension, whether he had swallowed a small

packet. Upon his denial of any such an occurrence, trial counsel asked for and received permission to bring before the accused a person identified as Agent Boyd. When the accused was asked if he had seen this agent on October 12, 1953, he offered resolute denial, then he commenced hedging in his answers and ended his explanation by stating that he could not be positive of either the date or the identity of the apprehending person because he had been picked up by Criminal Investigation Detachment and military police authorities on a number of occasions.

After the defense had closed its case, prosecution placed Agent Boyd on the stand and elicited from him the information that, at the place and on the date mentioned on cross-examination, Agent Boyd's partner in his presence apprehended the accused coming out of this narcotic cell; that while the accused was being searched, he reached into a pocket concealed on his right sleeve, removed an object, placed it in his mouth, and then swallowed it. Upon completion of the examination of this subject, the law officer instructed the court as follows:

"LAW OFFICER: Just a minute. The court is advised that the testimony relating to the 12th of October is admissible only for the purpose of impeaching the credibility of the accused as a witness. This testimony may not be considered by you as tending to prove that the accused is guilty of the offense charged at this time."

We are now solicited by the accused to hold that the cross-examination in the particulars set out and the receipt of the evidence regarding his prior apprehension was erroneous and prejudicial.

The theory of the Government at the trial was that the questioned evidence was admissible to show a plan or design on the part of the accused. It has abandoned that theory before this Court, and now contends that the law officer has some discretion in permitting cross-examination for impeachment purposes and that in this instance he did not abuse his discretion for two reasons:

first, that the prosecution had a right to rebut the appellant's primary defense of "alibi" as well as the ancillary defense of "lack of motive"; and second, that it was permissible for the Government to refute particular assertions and denials made by the appellant while a witness in his own behalf.

We do not believe an extended discussion of the rules concerning the extent of cross-examination or the admissibility of evidence is necessary in this case for the reason that we find the error, if any, to be harmless. In appraising prejudice in this instance, we direct attention to the fact that the law officer specifically instructed the members of the court-martial on the effect of character evidence. In addition, he told them that the questioned testimony was being admitted in evidence solely for the purpose of impeaching the credibility of the accused. The members were specifically told it had nothing to do with his guilt or innocence, but must be considered solely by them in assessing his trustworthiness as a witness. In United States v. Haimson, 5 USCMA 208, 17 CMR 208, we evaluated a claim of prejudice flowing from the admission of evidence which, for the purpose of one point, we assumed was erroneously admitted. In that case we stated:

"In view of the fact that this particular line of inquiry—initiated by the court—was fully developed by questions put by its own members, and the falsity of the accused's statements fully demonstrated, we have little hesitancy in concluding that it was this attempted deception by the accused which primarily undercut his defense. This, together with the compelling case offered by the Government, causes us to doubt the likelihood of material prejudice—conceding arguendo the presence of error. United States v. Chiarella, 184 F2d 903 (CA2d Cir); Allen v. United States, 26 F2d 246 (CA6th Cir); United States v. Wexler, 79 F2d 526 (CA2d Cir), cert den 297 US 703, 80 L ed 991, 56 S Ct 384."

In this case, the doubtful testimony was not developed first by the court, but

was unfolded by the accused. Assuming he could complain under those circumstances, his own testimony while on the stand was so inconsistent, unbelievable and contradictory that he destroyed any vestige of confidence which otherwise might have been reposed in him. Moreover, the evidence of guilt is so compelling that any reasonable person would find against the accused. His theory was alibi and, on direct examination, he contended that he was at the service club with his two friends; that he parted from them as they passed through the gate leading from the club; that he intended to catch a bus but missed those scheduled to run between the questioned area and camp; that he proceeded on foot to a point where he stopped to observe a small fire; that he was there picked up by a military police jeep and transported back to camp. He is corroborated in the following details: His two friendly witnesses testified that they parted from him as they left the service club, and that they did not see him in the narcotic cell; a military police sergeant testified that he gave the accused a ride at about 10:00 p.m. on the evening in question; and it was stipulated that there was a fire in the area identified by the accused.

The first and last two pieces of information are not in conflict with any other information found in the record. It can be conceded that there was a fire and that the accused was given a ride. The place where he was picked up and the area of the conflagration were between the house where he was searched and his camp site. The time and space elements were adequate enough to have permitted him to reach that locality after he ran away from his pursuers. That he could have separated from his companions, as they assert, and then proceeded to the narcotic cell is not improbable, as the evidence of the Government shows the two friendly witnesses came through the gate of the narcotic den first, and a third party, identified later as the accused, came in two or three minutes later. With those apparent reconciliations, that leaves only a statement by the two witnesses that they did not see the accused in the place at the time it

was raided. If, by that testimony, they intended to convey the impression that a third party, unquestionably the accused, did not arrive later, that impression is dissipated by the evidence of the Government supplemented by two other defense witnesses who testified positively to the contrary.

As to whether the accused exploded his own demeanor as a witness, we offer the following reasons why we conclude he did. Two Government witnesses positively identified him as being present at the raid. Prior to the discovery of the narcotics on his person, he identified himself by giving his name and his organization. When he outran the agent by running through a sewage disposal ditch partially filled with water, his clothing had to get muddy and wet. When the agent gave up the chase, he went to the area of accused's unit, found out his quarters' assignment, and waited at his bunk until he arrived. Recognition of the accused was immediate. At that time there was mud on his boots, trousers, and fatigue clothes in such a quantity that part of it was scraped off and retained for use as an exhibit. A number of disinterested witnesses observed this condition, and yet the accused sought to escape the incriminating effect of this evidence by contending that as he was attempting to get into the jeep, his cap dropped into a pool of water and he sought to make it wearable by wiping it on his trouser leg. All witnesses agreed that there had been no rain, the area was dry, and the jeep driver could not support accused's story. In addition, when the accused sought to explain the route he traveled, his activities between the time he left the club and his return to his quarters, his conduct when taken into custody, the reasons for his missing the buses that ran between the service club and the camp, and other relevant details, his palpable inconsistencies so completely demolished his own credibility that no reasonable person could believe him under oath. Moreover, his continuous changing of his testimony, while being cross-examined, indicates clearly that he was his own executioner. Finally, he volunteered testimony to the effect that he had been

apprehended a number of times by the Criminal Investigation Detachment and military police, and we are certain that the Government's confirmation of one of those incidents would have no appreciable effect on his trustworthiness.

When the evidence presented by both the Government and the accused is considered collectively, it compels a finding of guilt. The time and space factors merge perfectly. Three soldiers, one of them being the accused, are together at a service club. At a time consistent with other circumstances, they leave and two of them arrive at the narcotics den together. The third follows in short order. The three are ordered by the investigators to remain together as a group until searched. Two of them admit their presence and concede they were searched. The presence of the third person is so definitely established by accused's witnesses that any reasonable doubt about his being in the den is absent. The accused is positively identified as that third person, and the various means of identification are supplied by both himself and the Government. The entire record so bespeaks guilt that anyone familiar with it would be forced to conclude the court-martial members had no alternative other than to find the accused guilty without considering any and all evidence which he asserts was improperly admitted by the law officer.

As we have announced in previous cases, if the admission of the incompetent evidence could have had any measurable impact on the finding of guilt or innocence, then we grant a rehearing. In this instance, the possibility of any prejudice, if it be conceded arguendo, is so remote that a retrial is not considered necessary.

For the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

Judge BROSMAN concurs in the result.