UNITED STATES, Appellee

v.

SIDNEY T. JOHNSON, Sergeant, U. S. Army, Appellant

3 USCMA 709, 14 CMR 127

No. 2486

Decided February 12, 1954

LT COL James C. Hamilton, U. S. Army, 1ST LT Jack W. Tucker, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Following accused's trial by general court-martial, he was convicted of stealing from another soldier three suits of civilian clothing of a value in excess of $50.00. His sentence to dishonorable discharge, total forfeitures, and one year's confinement at hard labor, was approved by the convening authority and affirmed by a board of review. The accused's petition was granted by this Court to permit consideration of the possibility of prejudicial error in the following instruction to the court by the law officer:

". . . The fact that the accused's character is good has no bearing on whether he took the suits or not, and has no bearing on the crime of larceny."

## II

The testimony at the trial revealed that on the morning of July 2, 1952, one Corporal Porter discovered the loss of three of his suits; that shortly thereafter the clothing in question was located in the trunk of the accused's automobile; and that the accused at the time admitted the taking, and later executed a full, written confession before an agent of the Criminal Investigation Division. This confession recited that the accused had intended to pawn the clothing "until the end of the month, so I could give my people some money." At his trial the accused took the witness stand and explained that, shortly before the offense, he had been the victim of family financial emergencies, and that, for this reason, he had appropriated the wearing apparel of Corporal Porter. He reiterated that he had intended no more than to pawn the clothes until his wife's allotment check arrived, and he could "get enough for my personal use"—at which time he would "return them to Corporal Porter." The accused's wife also took the stand and spoke at length of the family's economic woes. In further corroboration of the accused's account of sudden financial need, the defense introduced a deposition from Sergeant Johnson's pastor, who asserted that the accused had importuned a certain Deacon Smith for money. The clergyman answered interrogatories concerning the accused's character in several statements: "I believe he is a good boy; his character is good . . . his general reputation is good . . . his reputation [within the church membership] is good, everybody speaks well of him." Other responses by the minister indicated that the accused resided off post with his wife "about 8 doors" from the deponent's church.

## III

Government counsel have asserted that the quoted testimony is without the purview of the sort of character testimony adverted to in the Manual for Courts-Martial, United States, 1951, paragraph 138f. One phase of this contention seems to come to the position that a minister's usual relationship with a member of his congregation would necessarily preclude the formation of a "reliable opinion" as to character — since the clergyman would, in the normal course of events, see the parishioner only in the latter's more sanctimonious moments, and thus would harbor a distorted picture of his rectitude. We are afraid that the acceptance of such a view would, in many cases, rob accused persons of character testimony from the individual best qualified to assert that the accused's character is not entirely depraved.

In light of the Manual's apparent liberal policy with respect to evidence of an accused's good character, we are unwilling to say that a person should be deprived of whatever benefit may be

**711**

implicit in his good deeds merely because those persons whose opinion of his character stems from observation of them might not have been in a favorable position to know of his misconduct, if any. Conversely, we would incline to reject any contention that police officials could not furnish admissible testimony concerning character for the reason that their occupation might conceivably produce dim and distorted impressions of humankind. Counsel may certainly be permitted to argue to the court-martial that an opinion of character is of little weight because the particular witness is by profession a Pollyanna or a misanthrope. However, we refuse so narrowly to construe the term "reliable opinion" for purposes of *admissibility*. Manual, supra, paragraph 138*f*(1). Nor do we wish, even impliedly, to be taken as saying that ministers of religion are, by reason of their profession, poor appraisers of character. Indeed, we suspect that their opinion of an individual normally is, and should be, given great weight by the Government in such areas as background, security investigations, and the like. Moreover, in the instant case, the clergyman testified by deposition that, during his two years of acquaintance with the accused, Sergeant Johnson frequently visited the church at times other than during scheduled services, and "several times came in and helped us to paint our Church."

Government counsel also urge that the pastor's testimony concerning Sergeant Johnson's reputation was inadmissible, since in essence it was limited to reputation among the membership of a single church. In the Government's eyes, the only admissible testimony concerning the accused's reputation would appear to be that which relates to reputation in the military community — namely that found at Fort Benjamin Harrison, his duty station. The Manual, however, clearly provides that "by 'reputation' is meant the repute in which a person is generally held in the community in which he lives or pursues his business or profession." Paragraph 138*f*(1). In analyzing

the alternative statement just quoted, we can only conclude that the accused "lived" in the civilian community off post where he and his wife maintained their home. Thus his reputation in that locale could be the subject of testimony by members of that community — a category which doubtless would include Sergeant Johnson's religious advisor. Cf. Wigmore, Evidence, 3d ed, §§ 1613, 1614. Moreover, testimony could certainly have been adduced regarding his reputation at Fort Benjamin Harrison — the station at which he pursued his profession as a soldier. This is true for the reason that the Manual has discarded any restriction that testimony is admissible only to show the reputation of a person in the community in which he lives, and not in the community where he plies his trade. See Wigmore, supra, §§ 1615, 1616.

## IV

We have determined that the court-martial had before it competent testimony concerning the accused's good character — evidence admissible to show in some degree the probability of his innocence. Manual, supra, paragraph 138*f*(2). No obligation whatever reposed on the law officer to instruct on the effect of character evidence, in the absence of a request from defense counsel at the trial level. United States v. Schumacher, 2 USCMA 134, 7 CMR 10. At the same time—and even without objection by defense—the law officer was certainly not free gratuitously to destroy all effect of character evidence in resolving the issue of guilt or innocence. In our opinion he sought— doubtless through inadvertence—to do just this when he furnished the instruction set out in an earlier portion of this opinion. United States v. Browning, 1 USCMA 599, 5 CMR 27. The prejudicial effect of this action, we believe, requires no further demonstration.

## V

It follows that the Government's only hope of salvaging the instant convic-

tion must turn on the contention that in his sworn testimony the accused had admitted all elements of larceny, and thereby had removed every issue in the case—as fully as if he had entered a plea of guilty. United States v. Dodge, 3 USCMA 158, 11 CMR 158. This contention would be tenable had the law officer told the court merely that accused's good character had "no bearing on whether he took the suits or not." Manifestly accused's good character would, if anything, only substantiate the conclusion that he was testifying truthfully when under oath he told court members that he had in fact taken the suits. However, the prior good character of an accused might weigh heavily in his favor in the minds of a court-martial uncertain whether to convict of mere wrongful appropriation or of larceny. Thus, the issue becomes one of whether the accused in his sworn testimony in effect had confessed to larceny—with the result that no reasonable court-martial could have found him guilty of the lesser included offense only.

The Government adverts to the following passage from the Manual for Courts-Martial:

". . . An intent to steal is implicit in a wrongful and intentional dealing with the property of another in a manner likely to cause him to suffer a permanent loss thereof. Consequently, a person may be guilty of larceny even though he intends to return the property ultimately, if the execution of that intent depends on a future condition or contingency which is not likely to happen within a reasonably limited and definite period of time. Thus one may be found guilty of larceny who conceals the property of another with intent to retain it until a reward is offered for it, or who pawns the property of another without authority, intending to redeem it at an uncertain future date and then return it." [Paragraph 200a(6).]

An argument can be constructed to the effect that the word "may," as used in the last two sentences of the quoted passage, must be construed to be only permissive in meaning, with the result that although property was pawned without intent to redeem at a *certain* future date, a court-martial would be free to find the accused guilty of wrongful appropriation only. Our interpretation, however, can only be that the term is qualified by the first of the three sentences quoted, and that a pawning plus an intent to redeem at an uncertain future time must normally be equated to larceny. On the other hand, we would not be inclined to consider that an intent "to redeem it at an uncertain future date," as used in the Manual, embraces an intent to redeem following receipt of pay and allowances at the end of the month. Although the alleged intent to redeem in this case be viewed as conditioned on receipt of Mrs. Johnson's monthly allotment check, we cherish sufficient confidence in the efficiency of the military service's finance authorities to avoid holding such receipt to be an "uncertain" event under Manual language. Government counsel have painstakingly surveyed the record in an endeavor to establish that there was no reasonable likelihood that the accused would be able financially to redeem Porter's clothing at month's end. However, our own examination of the same document renders this proposition doubtful. Consequently, we are unwilling to conclude that the lesser included offense of wrongful appropriation was effectively eliminated from the case by the accused's testimony. In support of this view, and in passing, we observe that the law officer in his instructions also treated wrongful appropriation as being in issue—although this action may conceivably be explained, consistent with the Government position, as amounting to no more than an overabundance of caution.

We wish to make wholly clear that the court-martial was, in no way, bound in its deliberations by the accused's protestation that he intended to redeem the clothes after pawning them. Common experience justified a high degree of skepticism toward insistence on the part of a discovered thief that he in-

tended to return the misappropriated property at a subsequent time. Moreover, the court-martial must decide for itself on the evidence whether the accused's intent and ability, if any, to return the items taken were so conditioned as to make it uncertain that, or when, he would be able to redeem. As we interpret the Manual, an accused may be guilty of larceny, although he has a fervent desire to return the misappropriated property to the owner—and indeed is guilty if his desire or ability is so conditioned by foreseeable events as to render it likely that the owner will suffer permanent loss.

VI

Having concluded that the law officer's instruction prejudiced the accused in his contention that he should be found guilty of wrongful appropriation merely, we must remand the record to The Judge Advocate General, United States Army, for further proceedings in accordance with the principles set out herein.

CHIEF Judge QUINN and Judge LATIMER concur.