UNITED STATES, Appellee

v

JACK V. BARNHILL, JR., Chief Warrant Officer, U. S. Army, Appellant

13 USCMA 647, 33 CMR 179

No. 16,346
April 19, 1963

*Clifford A. Sheldon, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Thomas H. King, Esquire, Lieutenant Colonel Ralph Herrod, Captain David M. Gill,* and *First Lieutenant John G. Milano.*

*First Lieutenant Robert E. Shepherd, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis M. Cooper* and *Captain Harvey L. Zuckman.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial in Eritrea, Ethiopia, convicted the accused of three specifications alleging the theft of a substantial quantity of Government property, ranging from fly swatters, valued at ten cents each, to a box of electrostrip valued at $230.75. With some exceptions as to the quantity of particular items and the total value, the convening authority approved the findings of guilty and the sentence, which includes a dishonorable discharge. A board of review affirmed the conviction. We granted further review to consider a number of assignments of error.

The accused was the Engineer Supply Officer at Kagnew Station, Asmara, Eritrea, Ethiopia. As such he was responsible for the receipt and distribution of large amounts of Government property. As a result of the lack of other available space, the personal property of individual military personnel, including that of the accused, was stored near Government property. In February 1961, the Post Engineer, Major Bennie H. Griffin, informed the accused the Inspector General was going to inspect the engineer operations. He told the accused he wanted the warehouse area "'Clean as a hound's tooth.'" The overall situation in the engineer section, which was handicapped by the language barrier between the military and native civilian personnel, prompted the accused to store some property off the base. On cross-examination, a Government witness testified the accused told him to "gather . . . scattered materials" and take them to the shop of a civilian carpenter who did work for the Army, "until the inspection is over." The witness also testified the accused "asked . . . whether . . . [he] had gone back to . . . [the carpenter's] shop to bring back the box," but the inquiry was made "sometime" after the Inspector General's inspection, which was held in March 1961. In April, the items stored in the carpenter's shop were seized by the local police. Other items were discovered in the storage area in a crate containing some of the accused's household effects. There is substantial conflict in the evidence as to whether these articles were inadvertently stored among the accused's effects, or whether they were taken by the accused with the intention permanently to deprive the Government of them.

At trial, the accused testified in his own behalf. He denied he had any intention to steal or appropriate any of the property in issue. He attributed the presence of Government property in his household effects to the general confusion at the warehouse, and to a misunderstanding of his instructions by a civilian employee. He said that he had told the employee to pack a "batch" of items which belonged to him; the Government property was only a few feet away and "could have got mixed in" with his property, which was being

packed for his return to the United States. The accused denied knowing that Government property was placed among his own effects, and he maintained he gave no instructions to pack the property with his things. As to the property found in the carpenter's shop, he insisted it was stored there only to get it out of the way for the Inspector General's inspection.

As part of his defense, the accused introduced evidence of his good character and military abilities. The first such evidence was elicited during the defense counsel's cross-examination of Major Griffin, who appeared early in the trial as a Government witness. The Major testified he knew the accused for about a year. In his opinion, the accused's character was "among the best," and "until this incident" he considered the accused to be "the best engineer supply officer" he had "ever run across." Later, in its direct case, the prosecution called Major Joseph Genovese, an Army Intelligence Officer, as a witness. He assisted agents of the Criminal Investigations Detachment in their investigation of the offenses. After testifying to certain pretrial statements by the accused, he was allowed, over defense counsel's objection, to state that he would not believe the accused under oath. Major Bridges, a Quartermaster Corps Officer, testified he knew the accused for about a year but had only "sporadic" association with him, and on the basis of that limited association he would believe the accused under oath. Captain Charles A. Powers testified he first met the accused in Texas, and knew him "On and off since 1959." He was of the opinion the accused "has good character," but he knew "nothing about his honesty." Major Glen B. Burt, Jr., a medical officer, knew the accused as a patient; he believed him to be a "fine character." Defense counsel then offered into evidence authenticated copies of the accused's official efficiency reports. Initially, the law officer admitted the records, but as defense counsel began to read matter from them the law officer interrupted. In the colloquy that followed, the law officer ruled the record entries were "not proper entries to establish character," and were "not admissible for any other reason" on the merits, but merely constituted "material in extenuation and mitigation." Thereupon, the exhibits were withdrawn from evidence, and the defense rested. On this appeal the accused maintains that the law officer's ruling was erroneous and prejudicial.

Evidence of good character and military proficiency is admissible on the merits and, under the circumstances of the case, may itself be sufficient to raise a reasonable doubt that the accused committed the offenses charged. United States v Johnson, 3 USCMA 709, 14 CMR 127; United States v McPhail, 10 USCMA 49, 27 CMR 123. The Manual for Courts-Martial states the rule as follows:

"In order to show the probability of his innocence, the accused may introduce evidence of his own good character, including evidence of his military record and standing and evidence of his general character as a moral well-conducted person and law-abiding citizen." [Manual for Courts-Martial, United States, 1951, paragraph 138f(2).]

Both the Government and the accused agree on the general rule of admissibility. However, they disagree strongly on the manner in which the evidence may be presented. Appellate defense counsel contend that efficiency reports are required by regulation as the "media for obtaining a continuous picture of each officer's performance and potential" (AR 623-105, paragraph 19a(3), May 2, 1961), and must be "true and impartial" (Department of the Army Form 67-4); consequently, they argue, the reports provide more available and more reliable evidence of accused's military conduct and standing than witnesses present in the area of trial, who might know the accused for only a short time. The Government contends that efficiency reports are mere matters of opinion and, as such, are inadmissible. See Manual for Courts-Martial, United States, 1951, paragraphs 139b, 144d; cf. United States v Roland, 9 USCMA 401, 26 CMR 181.

As to character evidence in general,

the 1951 Manual "abandoned" the distinction, that some American courts had evolved, between evidence of general reputation and opinion evidence of character. Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 213. It provided that a witness may state his *opinion* of the accused's character if "it is first shown that the witness has such acquaintance or relationship with the . . . [accused] as to qualify him to form a reliable opinion." Manual for Courts-Martial, supra, paragraph 138*f*(1); United States v Haimson, 5 USCMA 208, 17 CMR 208. Even before the Manual change, opinion evidence of the accused's military record and standing was regularly admitted as part of the accused's defense. A witness could testify that the accused "executed his orders in a very efficient manner," United States v West, 2 BR–JC 201, 205; that he did "a fine job," United States v Carpenter, 2 BR–JC 245, 255; and he was "rated in the upper three of five officers in the battery and the upper half of thirty-seven officers in the battalion," United States v Warrington, 4 BR–JC 297, 299; see also, United States v Hunt, 1 BR–JC 171, 172; United States v Sykora, 4 BR–JC 187, 189.

A random sampling of the court-martial reports shows that besides direct testimony by a witness, the record of the accused's actual efficiency ratings was regularly received in evidence. United States v Armstrong, 3 BR–JC 133, 138; United States v Missik, 3 BR–JC 243, 254; United States v Tooze, 3 BR–JC 313, 336; see also, United States v Haimson, supra. There are many sound reasons to support the rule of admissibility. Not the least of these is a case in which the accused is in a foreign land, far removed from persons with whom he may have served most closely. As a result, he may be compelled to rely upon persons who know him for only a short period of time.

Cf. United States v Schick, 6 USCMA 493, 20 CMR 209. Past practice and the manifest intent of the Manual for Courts-Martial to enlarge rather than restrict evidence of good character, require the conclusion that the law officer erred in ruling the efficiency rating reports inadmissible. See United States v Gagnon, 5 USCMA 619, 18 CMR 243; United States v Haimson, supra. Indeed, it is difficult to conceive of a better or more reliable means of establishing the accused's actual "military record and standing" than by his efficiency reports.[1]

Moving to the effect of the error, the Government contends it was not prejudicial for two reasons: (1) The efficiency reports were merely cumulative of the testimony adduced on examination of the Government and defense witnesses; and (2), in any event, the evidence of guilt is so "clear and compelling" that the excluded evidence of good character could not possibly benefit the accused. Neither argument is convincing. Apart from the fact that the law officer did not exclude the reports on the ground of cumulativeness, the record shows they could have contributed to the accused's defense. Cf. United States v Browning, 1 USCMA 599, 601, 5 CMR 27.

As noted earlier, the accused was in a foreign country. The persons in the community who testified for him had only a limited association with him. For example, Major Burt knew the accused only as a patient. We observed in United States v Browning, supra, at page 601, that evidence of good military conduct may be even stronger "than the customary evidence of good general character." The range of the accused's background covered by the witnesses did not nearly equate to that covered by the efficiency reports. Even Major Griffin's testimony, that the accused was the

---

[1] We are not unmindful of the Manual provision that, as an exception to the hearsay rule, the defense may "introduce affidavits or other written statements as to the character of the accused and as to matters in extenuation of a possible sentence." Manual for Courts-Martial, United States, 1951, paragraph 146*b*, page 273. We need not, however, decide whether this provision itself authorizes use of the efficiency reports in connection with the merits.

"best" engineering officer he had ever met, might have had greater weight if backed by the efficiency reports. They show the accused was consistently rated as "outstanding" in the performance of his duties to a degree "found in very few officers," and that he was an officer of "rare value to the service." They show, therefore, that Major Griffin's high opinion of the accused's military record was not an aberrant opinion of a single officer who knew the accused for only a short time, but the considered official opinion of a long line of superior commanders. Exceptional service in a particular office for a long period of time contributes greatly to the idea that the incumbent is not likely to violate his trust by pilfering property under his control. This is not to say, of course, that despite his superb background the accused might not have committed the offenses. Not infrequently, embezzlers are highly respected persons who discharge their general responsibilities in commendable fashion. What we are saying here is that exclusion of the efficiency reports was far from being inconsequential because of the other evidence of accused's military standing and conduct.

Turning to the Government's contention that the evidence of guilt is so strong as to justify affirmance of the accused's conviction, despite the error in excluding the efficiency reports, we pointed out in an earlier case that evidence of good character may alone be sufficient to create a reasonable doubt, despite the convincing nature of the other evidence. United States v McPhail, supra, pages 51, 53. The accused's guilt in this case depends to a large extent upon the resolution of conflicts in the evidence. Evidence of a record of over ten years of exemplary service as a warrant officer might well have tipped the balance in his favor. We are not persuaded, therefore, that the evidence of guilt is so strong that the exclusion of the records did not prejudice the accused.

Our conclusion in regard to the prejudicial effect of the exclusionary ruling makes it unnecessary to consider whether the accused was prejudiced by the law officer's ruling denying a defense objection to testimony as to the accused's bad character by Major Genovese, who apparently knew the accused only as a result of assisting Criminal Investigations Detachment agents in the investigation of the charges. Cf. United States v McClure, 11 USCMA 552, 29 CMR 368, and United States v Patterson, 1 BR–JC 75, 83. Our decision in United States v Briscoe, 13 USCMA 510, 33 CMR 42, disposes of the accused's claim of error as to the law officer's instructions on the nature of the punitive discharge that could be adjudged.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Judge KILDAY concurs.

FERGUSON, Judge (concurring):

I am in full agreement with the rationale of the principal opinion and the disposition which it orders. Because of that disposition, however, I believe we should also express our views on the second issue before us in order to prevent the same problem arising at a possible rehearing of the case.

In my opinion, Major Genovese's testimony concerning his opinion as to accused's credibility was, on the foundation shown in this record, inadmissible. The transcript reflects that Genovese was the chief investigator into the allegations involved in the charges and that he based his unfavorable views concerning the accused upon matters disclosed in that investigation. In United States v McClure, 11 USCMA 552, 29 CMR 368, we condemned the receipt of similar testimony from a pretrial investigation officer, and declared, at page 553:

"... The officer was only a legal conduit through which information on a criminal offense passed, and it could hardly be expected that he would get an unbiased report from witnesses who were being interviewed on a criminal charge. His activities may be likened to those of a witness who goes into a community for the purpose of ascertaining the reputa-

tion of a defendant and makes inquiry only of those citizens who are the victims of a crime. Under those circumstances it could hardly be contended that the witness had an opportunity regularly and for a sufficient period of time to make a reasonably comprehensive and reliable estimate of the character or reputation of the defendant."

In the case at bar, Genovese's opinion was predicated on the various statements the accused is alleged to have made to him during the course of the investigation. Permitting him to testify as to accused's credibility in effect allowed him to express indirectly his views on the value of the case which he had compiled against Barnhill and to base an opinion on credibility solely on the type of predicate which we held insufficient in United States v McClure, supra. A police officer should never be allowed so to testify, as he is really informing the jury that the accused is a liar simply because he denies the validity of the officer's case. Such testimony is unreliable and is no more than a bootstrapping effort by the investigator to strengthen the case for the Government without adequate foundation for the conclusion which he expresses.

Undoubtedly, an investigator may be qualified to testify that an accused has a bad character or a poor reputation for telling the truth, if he is shown to have had an adequate acquaintance with the latter's background to form the necessary opinion. Cf. United States v Griggs, 13 USCMA 57, 32 CMR 57. But the teaching of *McClure,* supra, is that such predicate may not be established by demonstrating only that the witness investigated the particular offenses with which accused is charged. On that basis, therefore, I would also find it error to receive Major Genovese's testimony concerning his opinion of accused's credibility and, in light of the posture of this record, that such error was prejudicial.