UNITED STATES, Appellee

v

FRANK C. SCHULTZ, Lance Corporal, U. S. Marine Corps, Appellant

18 USCMA 133, 39 CMR 133

No. 21,055

March 7, 1969

*Fred W. Shields, Esquire,* and *Lieutenant David E. Miller,* JAGC, USNR, argued the cause for Appellant, Accused. With them on the brief was *Lieutenant J. Arthur Bruno,* JAGC, USNR.

*Captain Lester G. Fant, III,* USMCR, argued the cause for Appellee, United States. With him on the brief were *Colonel C. R. Larouche,* USMC, and *Commander Walter F. Brown,* JAGC, USN.

Opinion of the Court

DARDEN, Judge:

Arraigned and tried by general court-martial at Chu Lai, Republic of Vietnam, accused was found guilty of

premeditated murder and sentenced to dishonorable discharge, total forfeitures, confinement at hard labor for life, and reduction to the pay grade of E–1. Intermediate appellate authorities affirmed the findings and sentence, but reduced the period of confinement to twenty-five years. This Court granted the accused's petition for review on two issues. For the reasons stated below, we affirm the decision of the board of review.

On the 27th of August 1966, the appellant volunteered for, and was placed in charge of, a four-man patrol commonly referred to as a hunter-killer team designed to ambush and kill Viet Cong. Specifically included as targets were those seen carrying a weapon at any time, as well as anyone found outside at night. At 3:00 a.m. on the above date, under the cover of darkness, the four men proceeded to a given "grid square" near Hoe Long Village, Khai Dong Hamlet, where they set up an ambush site. At dawn, fearing exposure, they proceeded to a different location. In so doing, Schultz stopped the patrol and entered a Vietnamese house, having said earlier, according to the testimony, that he intended to enter the dwelling and kill a "gook," or, in the words of a patrol member, "to take this man out of the house and shoot him."

Thus, the victim was separated from his family and led outside. Ignoring the man's identification card, the accused shot and killed his captive with a two- or three-round rifle burst in the head. No one had reason to believe the victim was an enemy or that he aided the Viet Cong. To the contrary, his wife and the village chief testified saying the victim was a farmer who had never helped the Viet Cong.

Following these events, the patrol hurriedly departed the area, eventually establishing another ambush site in an abandoned house. Spotted, they moved on to another location, later moving twice again for the same reason. Finally, at 3:30 p.m., they returned to the protection of their own perimeter.

The accused testified that he had set up his first ambush near Hoe Long Village where three trails forked. While looking over the area, he saw a light turned on in one of the homes. As dawn approached, he brooded about the death of two friends and the wounding of another. Looking again at the lighted house, he concluded that it was a signal, that Viet Cong were in the dwelling, and that he had to get inside and kill one. Thus, he went inside the home and pulled the victim outside. Ignoring the latter's identification card—for many Viet Cong possessed such identification—accused moved the Vietnamese man sixty meters down the trail, stopping in front of a Buddhist temple where he shot the man with his rifle.

The first granted issue requires us to consider:

"Whether the law officer erred in not tailoring his instructions to the defense theory that the accused believed he was justified in killing the victim on the ground he was a Viet Cong."

Appellate defense counsel assert that this Court has repeatedly imposed upon the law officer a duty to tailor his instructions and to furnish court members guidance on any defense concept for which there is any basis in evidence. United States v Amie, 7 USCMA 514, 22 CMR 304. Required, therefore, was an instruction covering the defense theory "that the appellant believed that the individual killed was a member of the VC, or that he was in communication with the enemy and was signalling the enemy and attempting to lead the appellant and his patrol into an ambush." Counsel for the defense also add that Schultz was a Marine who did what he was instructed to do, *"and what he felt he had to do to survive."* According to the defense, instructions given by the law officer totally failed to reflect these circumstances.

Appellate Government counsel view the above theory simply as one of confession and avoidance. Having fully confessed in open court, the ac-

cused attempts to "avoid" its consequence by showing either justification or excuse. Cf. Article 118, Uniform Code of Military Justice, 10 USC § 918.

Under the facts of this case, we concur with appellate Government counsel that this argument should be rejected. ▮ The testimony of the accused shows his actions to be intentional. Thus removed is the possibility that death of the victim resulted from accident or misadventure. Cf. United States v Redding, 14 USCMA 242, 34 CMR 22. Moreover, self-defense is unavailable for it is a plea of necessity not available, normally speaking, to one who is an aggressor. United States v O'Neal, 16 USCMA 33, 36 CMR 189. Indeed, we are satisfied the accused's own portrayal of the facts reflects only a premeditated design to kill, in contrast to unpremeditated murder, voluntary or involuntary manslaughter. We conclude, in short, that the killing of Huygen Loi was an act performed without excuse or justification.

There is not an iota of evidentiary support that the victim was a Viet Cong or its sympathizer. Cf. United States v Boberg, 17 USCMA 401, 38 CMR 199. Similarly, there is no factual basis supporting the belief that house lights were used as a means of signalling the enemy. But, even if we were to assume the contrary, accused had taken his victim prisoner. The conduct of the accused toward the prisoner had to be governed by this relationship. Article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War (6 UST 3316, 3320, TIAS 3364, August 12, 1949) includes the category of militia or volunteer corps. Article 5, in turn, further provides in part:

"Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal." [6 UST 3316, 3322, 3324.]

Article 13 specifically proscribes " 'Any unlawful act or omission by the Detaining Power causing death . . . of a prisoner.' " (6 UST 3316, 3328).

Similarly, Article 5 of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War (6 UST 3516, 3520, 3522, TIAS 3365, August 12, 1949), provides, in essence, that such persons under definite suspicion of hostile activities to the security of a Party to the conflict "shall nevertheless be treated with humanity, and in case of trial, shall not be deprived of the rights of fair and regular trial prescribed by the present Convention."

We need not here decide into which of these categories the victim in this case might fall. We do point out that whatever his possible classification, he was entitled to protection against summary execution.

The appellant cannot avail himself of the bare suggestion that he acted under orders. By entering ▮ the Vietnamese home, he boldly exceeded his authority. The issuance or execution of an order to kill under the circumstances of this case is unjustifiable under the laws of this nation, the principles of international law, or the laws of land warfare. Such an order would have been beyond the scope of authority for a superior to give and would have been palpably unlawful. See United States v Kinder, 14 CMR 742, and the abundant authority contained in that case.

Absent a legally recognizable defense, the law officer was not required to give instructions in this area. Failure to do so was, under the facts of this case, neither erroneous nor prejudicial. United States v Amie, supra; United States v Sitren, 16 USCMA 321, 36 CMR 477; United States v Sheeks, 16 USCMA 430, 37 CMR 50.

The remaining issue is:

"Whether the law officer erred in denying the defense request (R. 97)

for character instructions and, if error, was it prejudicial."

In this instance, appellate defense counsel remind us that good character, though not regarded as proof of innocence, may nevertheless have the effect of raising a reasonable doubt as to guilt. United States v Browning, 1 USCMA 599, 5 CMR 27; United States v Johnson, 3 USCMA 709, 14 CMR 127; United States v Pond, 17 USCMA 219, 38 CMR 17. Another contention is that although an act has been conclusively shown to have occurred, a character instruction may, in a proper case, cast doubt upon the degree of an accused's guilt—if any at all. The omission of such an instruction can, therefore, result in prejudicial error. United States v Mathis, 17 USCMA 205, 38 CMR 3.

In a two-pronged reply, appellate Government counsel initially respond that the law officer properly refused a requested instruction on character because evidence relating to the appellant's performance of military duties is not considered evidence fitting this category. Should it be so held, appellate Government counsel then suggest that accused's judicial confession removed the need for an instruction on character, for where the criminal act is conceded, conviction must necessarily follow even if the accused is a paragon of virtue.

The facts in this regard depict the accused as a "good Marine," one who did "a real good job," and ▍ as an individual who was trusted. He was also known as a good soldier who stood up well in combat. This is character evidence. This Court has said on more than one occasion that good soldierly character may well be stronger than customary evidence of good character. United States v Browning, supra; United States v Barnhill, 13 USCMA 647, 33 CMR 179; United States v Sweeney, 14 USCMA 599, 34 CMR 379. We add, with emphasis, that failure of a law officer to give requested character instructions in a proper case may well result in reversible error.

Drawing a parallel between United States v Mathis, supra, and the case at hand, appellate defense counsel urge the existence of reversible error here. We hold, however, that Mathis is not a controlling precedent here. There, self-defense and insanity were both placed in issue. On this basis the Court stated:

"The error in the law officer's rationale, clearly revealed by this colloquy, is that not every homicide amounts to a crime and it is only the former which is admitted by the defense. That a crime of any degree was committed is a conclusion they totally reject." [Emphasis supplied.] [United States v Mathis, supra, at page 208.]

In this case, by comparison, self-defense is not present. The testimony of two psychiatrists—one for the Government, one for the defense—shows accused as having suffered from probable partial mental impairment. As the Court said in United States v Storey, 9 USCMA 162, 167, 25 CMR 424:

". . . More than partial mental impairment must be shown in order to raise the issue. There must be evidence from which a court-martial can conclude that an accused's mental condition was of such consequences and degree as to deprive him of the ability to entertain the particular state of mind required for the commission of the offense charged. United States v Kunak, 5 USCMA 346, 17 CMR 346."

Thus, here, the appellant's in-court testimony—absent a complete defense—amounted to a judicial confession of murder. The nature of this testimony has its effect on instructional requirements. With evidence in this posture, an instruction on character evidence is not mandatory. In United States v Dodge, 3 USCMA 158, 11 CMR 158, this Court specifically held that once the crime is admitted, character evidence, on the question of innocence or guilt, is of no effect. Cf. United States v McPhail, 10 USCMA 49, 27 CMR 123. Applying the rationale of these cases, we find no prejudicial

error here resulting from the omission of an instruction on character.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree with the majority in this case that the law officer did not err by not instructing on the defense theory that the accused believed he was justified in killing the victim on the ground he was a Viet Cong. The Articles of the Geneva Convention Relative to the Treatment of Prisoners of War and the Protection of Civilian Persons in Time of War (6 UST 3316, 3320, *et seq*, TIAS 3364, and 6 UST 3516, 3520, *et seq*, TIAS 3365, August 12, 1949) adequately spell out the humane manner in which we, as a nation, have agreed to conduct ourselves toward persons in these categories. If we hope to be accorded similar treatment we must ourselves adhere to these principles.

I do not, however, agree that the law officer did not err in denying a defense request for character instructions. I believe that the principle established in United States v Mathis, 17 USCMA 205, 38 CMR 3, is applicable here and would reverse this conviction.

The accused was found guilty by a general court-martial, convened at Chu Lai, Vietnam, of premeditated murder. He was sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for life, and reduction to the pay grade of E-1. Intermediate authorities affirmed the findings and sentence, with a reduction of the period of confinement to twenty-five years.

On the day in question, accused was in charge of a four-man patrol commonly referred to as a hunter-killer team designed to ambush and kill Viet Cong. Specifically included as targets were anyone seen carrying a weapon at any time, as well as anyone found outside at night, whether armed or not. An ambush site was set up in the early morning hours. At dawn, fearing exposure, the patrol moved to another location. As they were leaving the area, the accused entered a nearby house where he found a Vietnamese male. He took the man outside, proceeded with him down the trail about sixty meters where he shot him with his rifle.

The accused testified under oath and detailed his rather extensive participation in combat operations in Vietnam, beginning with his arrival as a member of an amphibious landing operation denominated Operation Double Eagle Phase I in January 1966. This was followed by Phase II of the same operation after which the accused was evacuated to a naval hospital in Japan suffering from an acute case of gastroenteritis. He returned three weeks later and participated in Operations Hotsprings, Wyoming, and Kansas. After Kansas, his battalion was located in "the sandpit" on Marble Mountain for a period of time until Operation Bucks. It was in this last-named encounter that he lost two very close friends under rather unnerving conditions. While he had seen many men die in combat, this, according to accused, upset him the most. The unit then returned to the sandpit from where it operated various patrols and ambushes.[1]

On the day prior to the occurrence of the charged offense he visited another friend in a field hospital who "had had his guts blown out." After leaving the hospital he started to feel sick and returned to his unit where he immediately volunteered for a patrol. The patrol was uneventful and when he learned that the platoon commander was looking for volunteers for a hunter-killer team, he was the first to ask to go. He stated that he thought he "knew the area and could get a VC." The platoon commander

---

[1] The "sandpit" was described by the accused's platoon commander as a "big stretch of open sand, fairly hot. There are holes dug in the ground and ponchos for shelter and we ate c-rations."

tried to talk him out of going and told him it was almost suicide. Nevertheless, he persisted and was placed in charge of the four-man unit. The ambush was set up near a village at about 3:30 a. m. During the hours of darkness nothing occurred and the accused related that he began thinking about his friends and comrades and how they looked in death or when injured. The memories haunted him and to some extent he began to hallucinate. While in the ambush he noticed a light go on in a house. As time wore on he realized that the light continued to burn and "then it hit me. It was a signal. There was a VC in that house. And so, and so I just . . . it was about, about getting light, so I motioned to the patrol to get up. I wanted to get to that house. I had to kill a VC for those guys, I just had to kill one. And during when I was walking towards the house, some of the men mentioned something about my saying I had to kill a 'gook.' I don't remember this but I probably did, and I went to the house and there was a man in there, so I went to the door of the house and pulled the man out. I pulled him out in front of the house and he was pulling out his ID card and was showing it to me but this didn't matter to me because I had seen many VC before that I'd killed with ID cards on them identical to that. I got him in back of the shirt here and shoved him down the trail, maybe sixty meters or so in front of this Buddist [sic] temple, and I had to kill him. I had to kill a VC. I brought my rifle to my shoulder and shot him."

On cross-examination, the accused repeated his testimony that "I had to kill a VC." "I couldn't sleep at night, I had to help these guys that were dead, I had to do something for them, knowing that their lives weren't wasted."

Psychiatric testimony at trial revealed that while the accused had the ability to distinguish right from wrong, his ability to adhere to the right at the time of the offense was impaired because of his emotional involvement and the fact that he was under a considerable amount of emotional tension. A prosecution psychiatrist testified that this impairment was of some degree, but by no means total. A defense psychiatrist found the impairment to be of a significant nature but not amounting to what is classified as a psychosis.

In addition, the defense presented testimony bearing on the character of the accused. He was classified by his then platoon commander as the best rocket gunner in the unit; a trustworthy marine; one who stood up well in combat and did a real good job. "At times I have seen him stand up while people were shooting at him and fire his rocket." The commander had been on a number of patrols with the accused ("[h]e was the person we had to call up to spot targets"), and had sent him on the fatal hunter-killer operation.

Based on this and other similar testimony, defense counsel requested an instruction on character testimony. The law officer denied the request without comment.

In the early case of United States v Browning, 1 USCMA 599, 601, 5 CMR 27, we observed that:

". . . [C]ourts have repeatedly held to be reversible error a refusal to charge the jury that evidence of good character alone may be sufficient to warrant acquittal, even though evidence of guilt may be convincing. Edgington v United States, 164 US 361, 41 L ed 467, 11 S Ct 72; Egan v United States, 287 F 958 (CA DC Cir); Jones v United States, 289 F 536 (CA DC Cir). . . . Wigmore goes so far as to say that evidence of good soldierly character is even stronger than the customary evidence of good general character. Wigmore, Evidence, 3d ed, § 59."

Similarly in United States v Barnhill, 13 USCMA 647, 649, 33 CMR 179, we said:

"Evidence of good character and military proficiency is admissible on the merits and, under the circumstances of the case, may itself be sufficient to raise a reasonable doubt

**139**

that the accused committed the *offenses charged.* United States v Johnson, 3 USCMA 709, 14 CMR 127; United States v McPhail, 10 USCMA 49, 27 CMR 123." [Emphasis supplied.]

See also Manual for Courts-Martial, United States, 1951, paragraph 138*f* (2); United States v Harrell, 9 USCMA 279, 26 CMR 59; United States v Sweeney, 14 USCMA 599, 34 CMR 379; United States v Conrad, 15 USCMA 439, 35 CMR 411; United States v Sitren, 16 USCMA 321, 36 CMR 477; United States v Flippen, 16 USCMA 622, 37 CMR 242; United States v Pond, 17 USCMA 219, 38 CMR 17.

An instruction on this issue is of particular importance where, as here, the question of an accused's mental responsibility has been raised. As we stated in United States v Cooper, 15 USCMA 322, 326, 35 CMR 294:

"Accused having presented evidence of his good character and the intended instruction not having been delivered to the court prior to its return of findings of guilty, it is apparent that prejudicial error was committed, particularly in light of the substantial issue which existed regarding accused's mental responsibility for the alleged acts."

Most recently in United States v Mathis, supra, we held the law officer's refusal to give an instruction relating to good character to be prejudicial error. I believe *Mathis* to be directly in point with the case at bar.

Mathis too was charged with, and convicted of, premeditated murder. The evidence reflected that following a consensual homosexual encounter, Mathis felt impelled to kill his co-actor. During a struggle he repeatedly stabbed the victim with a knife and while the latter lay on the ground, Mathis went approximately ninety feet to get a rock, which he used to squash the victim's head. Thereafter, he carried away the rock to hide it. While the law officer gave an instruction on mental responsibility, he reversed his previous position that he

would also instruct on good character, saying:

" 'THE LAW OFFICER: Before we call back the court we will have now a short continuation of this hearing. Now, I have read over *the proposed* character instructions and it says "such evidence may indicate to you that it is impossible that a person of good character would commit the crime charged." There is no doubt in this case, Major Dribben, that the accused has committed the act?

" 'THE DEFENSE: No sir.

" 'THE LAW OFFICER: So it is not a question of whether he has committed or not but his mental responsibility; so I don't think character is a proper instruction and I reverse myself 180 degrees and I will not give that request.' " [*Ibid.*, at pages 207–208.] [Emphasis supplied.]

In commenting on this colloquy we noted, at page 208:

"The error in the law officer's rationale, clearly revealed by this colloquy, is that not every homicide amounts to a crime and it is only the former which is admitted by the defense. That a crime of any degree was committed is a conclusion they totally reject."

My brothers attempt to distinguish our position in *Mathis* on the ground that in this case "the appellant's in-court testimony—absent any legally accepted defense—amounted to a judicial confession of the crime charged." Citing United States v Dodge, 3 USCMA 158, 11 CMR 158, they hold that "once the crime is admitted, character evidence, on the question of innocence or guilt, is of no effect. Cf. United States v McPhail, 10 USCMA 49, 27 CMR 123." But *Dodge* is inapposite for the issue of that accused's mental responsibility was not in evidence. All homicides are not crimes.

Mathis also testified at his trial and there was no contest as to the factual issue of the homicide. His

sanity was in issue, testimony for both sides making it a controverted question of fact. Mathis' defense was directed primarily toward his feeling that he was impelled to kill the victim because of his hatred for homosexuals. It was this hatred, allegedly, which caused him to commit the homicide. The jury had to find that Mathis premeditated his act and as we said therein, "good character alone is sufficient to provide a reasonable doubt as to guilt."

In this case the accused admitted the homicide and testified that "he had to kill a VC" in order to avenge the deaths and injuries of his friends. He believed the man he shot to be a Viet Cong because he was signalling in the night. His mental responsibility, as it might affect the question of criminal intent, was placed in issue. Failure to instruct on the effect of good character evidence was, in my opinion, prejudicial error. United States v Mathis and United States v Cooper, both supra.

I would reverse the decision of the board of review and order a rehearing.